E-FILED
CIVIL DIVISION
11/30/2023 11:43:28

CL-2023-0016939

John T. Frey
CLERK, CIRCUIT COURT
FAIRFAX, VA

V I R G I N I A:

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

JOSHUA WRIGHT,                              )
                                           )
                                           )
         Plaintiff,                        )
                                           )
v.                                         )        Case No.
                                           )
THE RECTOR AND VISITORS OF                 )        JURY TRIAL DEMANDED
GEORGE MASON UNIVERSITY,                   )
4400 University Dr.,                        )
Fairfax, Virginia 22030,                   )
                                           )
AND                                        )
                                           )
THOMAS BLUESTEIN,                          )
*in his individual and official capacities,*   )
4400 University Dr.,                        )
Fairfax, Virginia 22030,                   )
                                           )
         Defendants.                       )
_____   )

## COMPLAINT

George Mason University would rather lose in court than lose in the press. In its handling of false misconduct allegations against Mr. Wright, the University repeatedly and flagrantly violated Title IX regulations and its own policies. In a clear showing of bias, the University hosted Mr. Wright's false accuser as a #metoo speaker on campus, paid her and her co-conspirator hundreds of thousands of dollars each,[1] made public statements in support of her and against Mr. Wright, retaliated against him for his lawsuit, and used different standards when deciding whether to allow his

---

[1] Despite having received nearly a half million dollar payout, the complainant and her co-conspirator subsequently established a "Go Fund Me" to solicit an additional $2 million from the public.

complaint to go forward against his accuser, resulting in the dismissal of his complaint. In other words, the University repeatedly put its thumb on the scale in favor of the female complainant instead of ensuring fairness, due process, and even applying its own policies. Accordingly, Mr. Wright brings this complaint for violations of Title IX, the Equal Protection Clause and Due Process Clause of the Fourteenth Amendment to the United States Constitution, the Petition Clause of the First Amendment to the United States Constitution, and for breach of contract.

## JURISDICTION

1.     All tortious conduct occurred in Fairfax County, Virginia. Thus, jurisdiction in this Court is proper.

## THE PARTIES

2.     Plaintiff Joshua Wright is a Virginia resident of Fairfax County. Mr. Wright was previously a law professor at George Mason University (the "University").

3.     Defendant The Rector and Visitors of George Mason University is a public corporation operating as "George Mason University" pursuant to Va. Code §23.1-1500. It will be referred to herein as "George Mason University" or the "University."

4.     Defendant Thomas Bluestein is the Title IX Coordinator for the University. Defendant Bluestein is chiefly responsible for the University's compliance with Title IX as well as the initiation and adjudication of all Title IX matters at the University. He assumed this position in January of 2023.

## FACTUAL BACKGROUND

### Mr. Wright

5.     Mr. Wright began his career as a law professor at the University in 2004.

6.     While employed by the University, his employment was subject to the policies of the University.

7.     All University policies and regulations were incorporated by reference into his employment contract.

8.     Throughout his tenure as a professor, the University and others repeatedly recognized the dedication he offered his students.

9.     The University promoted Mr. Wright to Assistant Professor in 2005, Associate Professor in 2010, Professor of Law in 2011, and finally to the top faculty position of University Professor in 2016.

10.     In 2014, the Federalist Society awarded Mr. Wright the Paul M. Bator Award, a national award given annually to a law professor under the age of forty who has "demonstrated excellence in legal scholarship, a commitment to teaching, a concern for students, and who has made a significant public impact."

11.     Over the years, Mr. Wright intermittently left his position at the University to enter public service at the Federal Trade Commission ("FTC"), including as FTC Commissioner.

12.     Additionally, Mr. Wright simultaneously taught at the University and held positions in private law practices while also managing his own consulting business.

3

13.    In December 2021, Mr. Wright was falsely accused of sexual misconduct in a formal Title IX complaint by his former girlfriend with whom he was in an on-and-off relationship for approximately eleven years.

<u>The University's Background</u>

14.    Institutions of higher education are required by law, as interpreted by the United States Supreme Court, to adjudicate claims of sexual harassment under the auspices of Title IX. 20 U.S.C. §1681. Title IX is a federal statute prohibiting discrimination on the basis of sex in education.

15.    Should the University fail to adequately remedy sexual harassment on campus, it could be very costly for the University, including by having to face litigation from alleged victims of sexual assault. This litigation is not only costly but also tends to subject the University to extremely negative press. The plaintiffs suing schools for failing to adequately remedy sexual harassment tend to be female.

16.    In April 2011, pressure on the University increased when the Obama Administration's Department of Education published a "Dear Colleague Letter."[2] This guidance, despite not having undergone the formal rulemaking process, demanded universities receiving federal funding to weaken procedural protections for the accused, including limiting the right to a hearing for those accused of sexual harassment and lowering the burden of proof to preponderance of the evidence. Indeed, the Department threatened that "[w]hen a recipient does not come into

---

[2] Office Of The Assistant Secretary, *Dear Colleague Letter*, U.S. DEPARTMENT OF EDUCATION (April 4, 2011), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html.

compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation."

17.    The Dear Colleague Letter, and later-issued guidance, publicized statistics of an alleged rape epidemic on college campuses targeting female students. These statistics have been debunked.[3]

18.    The Dear Colleague Letter incentivized universities receiving federal funding, including Defendant University, to find male accused students and faculty responsible regardless of the weight of the evidence against them, because if the Department of Education saw the University as insufficiently protective of alleged female sexual harassment victims, it could withdraw federal funding from the University, as threatened in the Dear Colleague Letter.

19.    Defendant University receives federal funding.

20.    Defendant University recently signed two "Resolution Agreements" with the Department of Education's Office for Civil Rights, where the Department found that the University had violated anti-discrimination laws, including Title IX.

21.    The Department of Education has, since 2016, been investigating the University for its failure to comply with Title IX as it relates to the University's response to sexual violence on campus.

22.    Withdrawal of federal funding by the Department of Education would be financially ruinous for the University.

---

[3] Ashe Schow, *No, 1 in 5 women have not been raped on college campuses*, WASHINGTON EXAMINER (Aug. 13, 2014, 10:31 AM), https://www.washingtonexaminer.com/no-1-in-5-women-have-not-been-raped-on-college-campuses.

23.     Therefore, the University and its employees have an incentive to find Mr. Wright responsible, as a male accused, regardless of the lack of weight of evidence against him, to ensure it continues to receive federal funding and to avoid bad press.

24.     Thus, once Mr. Wright was falsely accused, the University and its employees had incentive to limit any chance Mr. Wright had at defending himself by subjecting him to an inherently unfair process.

25.     The Dear Colleague Letter was rescinded in 2017. The University, however, retained all, or nearly all, of the staff positions the Dear Colleague Letter and its subsequent iterations required. These staff positions include a formal Title IX office and a Title IX Coordinator, both tasked with the enforcement of federal guidance on campus.

26.     The University's continued compliance with the Dear Colleague Letter and related guidance, even after it was rescinded, operationalized the anti-male bias inherent in the Dear Colleague Letter and subsequent guidance, permitting that bias to remain in full force at the University after the federal guidance was formally rescinded. Further, the investigation that began in 2016 (before the Dear Colleague Letter's recission) is still ongoing.

27.     Indeed, the author of the subsequent guidance enforcing the Dear Colleague Letter, Assistant Secretary for Civil Rights of the Department of Education Catherine Lhamon, resumed her position at the Department of Education as of October 20, 2021, after a party-line confirmation vote in the United States Senate. Therefore, the University was on notice that a proponent of the Dear Colleague

6

Letter, who expressed open hostility to male accused students and faculty in her confirmation hearings and past writings, was again in a position to withdraw federal funding from the University if she felt that the University was inadequately protective of female victims.

28.    Similarly, around the time that the Dear Colleague Letter was rescinded, the #metoo movement began. While the movement succeeded in removing certain male bad actors from positions of power, it consequently casted too many men as those bad actors. As a major social movement, it also had the effect of pressuring institutions to comply with the movement's goals: retribution against supposedly powerful men for historical or societal wrongs. Large institutions did not want to be on the receiving end of scathing press casting them as enablers of bad and powerful men. Suffice it to say that after the Dear Colleague Letter was rescinded, something equally as coercive took its place.

29.    The University took no effective steps to ensure that its employees were free of bias on the basis of sex.

<u>The University's Policies</u>

30.    Until approximately September 2023, the University did not prohibit consensual romantic relationships between employees and students.

31.    As of August 14, 2020, the University was obligated under 34 C.F.R. §106 to establish a Title IX grievance process consistent with 34 C.F.R. §106.45, which sets forth in substantial detail how the University may adjudicate formal

complaints of sexual harassment, sexual assault, dating violence, domestic violence, stalking, and retaliation.

32.    Pursuant to this regulation, among other requirements, upon receipt of a Title IX formal complaint, the University must assess the complaint to determine whether it *must* dismiss the complaint under 34 C.F.R. §106.45(b)(3)(i), or whether it *may* dismiss the complaint pursuant to 34 C.F.R. §106.45(b)(3)(ii).

33.    The University *must* dismiss a formal complaint "[i]f the conduct alleged in the formal complaint would not constitute sexual harassment as defined in §106.30 even if proved, did not occur in the recipient's education program or activity, or did not occur against a person in the United States…" 34 C.F.R. §106.45(b)(3)(i). "For the purposes of this section… §106.45, 'education program or activity' includes *locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs*, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution." 34 C.F.R. §106.44(a) (emphasis added).

34.    Therefore, if a formal complaint alleges conduct in which the University does not exercise "substantial control over both the respondent and the context in which the sexual harassment occurs," the University must dismiss the formal complaint. The University's Policy 1202 tracks this same mandatory dismissal language, in compliance with §§106.44, 106.45.

35.    The University *may* dismiss a formal complaint pursuant to 34 C.F.R. §106.45(b)(3)(ii) when "if at any time during the investigation or hearing: A

8

complainant notifies the Title IX Coordinator in writing that the complainant would like to withdraw the formal complaint or any allegations therein; the respondent is no longer enrolled or employed by the recipient; or specific circumstances prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein." 34 C.F.R. §106.45(b)(3)(ii).

36.    The University is also obligated to presume any respondent to a Title IX proceeding "not responsible" for the alleged violation until the end of the grievance process. 34 C.F.R. §106.45(b)(1)(iv). The University's Policy 1202 contains the same presumption.

37.    The University also prohibits retaliation under 34 C.F.R. §106.71; however, "[t]he exercise of rights protected under the First Amendment does not constitute retaliation…" 34 C.F.R. §106.71(b)(1).

38.    At all times, by regulation or by the plain language of the statute, the University was obligated to treat its students and faculty equitably and without discriminating on the basis of sex. 20 U.S.C. §1681; 34 C.F.R. §106.44.

<u>Elyse Dorsey's Harassment Toward Mr. Wright</u>

39.    While teaching at the University, Mr. Wright met Elyse Dorsey.

40.    In the summer of 2010, Mr. Wright and Ms. Dorsey began a romantic relationship.

41.    Mr. Wright and Ms. Dorsey's relationship continued for eleven years, on an on-and-off basis.

42.    Throughout their eleven-year relationship, they went on vacations together and shared many mutual interests.

43.    Also, throughout their relationship, they collaborated on many different projects as they were both involved in the antitrust legal community.

44.    They were both respected members of professional associations, including the Federalist Society and the American Bar Association.

45.    They published academic papers together (at least six over the course of four years).

46.    They also collaborated on different research projects.

47.    Mr. Wright supported Ms. Dorsey's career and she supported his.

48.    Indeed, in 2021, Mr. Wright helped to create and obtain a fellowship with the University of Virginia ("UVA") for Ms. Dorsey, including undertaking significant effort to persuade companies to fund the fellowship.

49.    Mr. Wright also engaged her to perform some work as an independent contractor for his consulting firm after she asked for help, needing to make extra money while waiting for her fellowship at UVA to begin.

50.    Eventually, in late October 2021, Mr. Wright ended the on-and-off relationship with Ms. Dorsey. During the breakup, which occurred in writing, Mr. Wright told Ms. Dorsey that the reason he was breaking up with her was to pursue another romantic relationship.

51.    Immediately after Mr. Wright ended the relationship with Ms. Dorsey, she became hostile and vindictive.

52.     When he broke up with her, she responded in a text message, "WHAT THE ACTUAL FUCK" and "you know I deserve more than a fucking text right now."

53.     She proceeded to send a series of angry text messages, including:

    a.  "you *promised* me multiple times you would be here. But you're doing the opposite – you're abandoning me, in the worst possible way… that's straight fucked up."

    b.  "I'm so embarrassed for thinking you ever respected me, let alone love me."

    c.  "you're being so mean to me and IDK why."

    d.  "Idk what I've done so wrong in my life to end up in this total dumpster fire right now… or why I'm so expendable to you. That you seem to keep going out of your way to hurt me."

    e.  "I need you, at a minimum, to call me, bc [sic] right now, I could not possibly think less of you… you say you're all about loyalty – show it. Right now, for once."

    f.  She concluded with disparaging Mr. Wright's current relationship: "I mean, I get you not wanting to see me. But you're going back to [current girlfriend] – after how horribly she's treated you, your family, everyone you *say* you care about… Jesus Christ."

54.     After Ms. Dorsey sent the above text messages, she came uninvited to the law school and waited outside one of Mr. Wright's classes and followed him to his office.

55.     Once in his office, she loudly yelled at him regarding the end of their relationship and demanded to have a conversation with him.

56.     After Mr. Wright refused to have further conversation with her, Ms. Dorsey repeatedly tried to contact Mr. Wright's girlfriend with several calls and text messages, which were unwelcome by Mr. Wright's girlfriend.

57.     Ms. Dorsey also repeatedly contacted Mr. Wright's assistant in an attempt to reach Mr. Wright or to disparage him.

58.     Ultimately, this persistent and aggressive conduct made Mr. Wright fearful for his safety and his children's safety, as Ms. Dorsey had proven herself to be extremely erratic and unpredictable.

59.     Ms. Dorsey's conduct, however, persisted.

                Ms. Dorsey Filed a False Title IX Complaint Against Mr. Wright

60.     Despite their long history of a consensual, romantic relationship, Ms. Dorsey decided to file a false Title IX complaint against Mr. Wright on December 12, 2021.

61.     Presumably, in retaliation for the breakup, Ms. Dorsey embarked on a plan to ruin Mr. Wright's reputation and his life.

62.     Ms. Dorsey alleged to Title IX, among other things, that she had been sexually assaulted by Mr. Wright at the beginning of their eleven-year romantic relationship, and, remarkably, that the entire eleven-year relationship had been a product of coercion.

63.     Ms. Dorsey also alleged falsely that after *she* ended the relationship with Mr. Wright, he took adverse actions against her, including: (1) removing Dorsey as an adjunct faculty member for the Antitrust II course in the online LLM program for the spring 2022 semester; and (2) frustrating/delaying Wright's receipt of stipend funds associated with a visiting scholar position at the University of Virginia.

64.     When Ms. Dorsey made all of these statements, she knew they were false.

65.     Among other things, despite Ms. Dorsey's assertions, text message evidence shows unequivocally that Mr. Wright ended the relationship.

66.     Beyond these inconsistencies, Ms. Dorsey's Title IX Complaint included a plethora of additional lies, proven false by contradictory evidence. For example, Ms. Dorsey alleged during the Title IX investigation that Mr. Wright had or has a relationship with a current student. That student denied ever having a relationship with Mr. Wright.

67.     On July 8, 2022, Ms. Dorsey amended her complaint to include a retaliation charge, alleging that after she filed the complaint, Mr. Wright somehow restricted her ability to teach an Antitrust class at the University.

68.     Contrary to this allegation, the Dean of the Law School, Ken Randall, provided in the Title IX investigation that while Mr. Wright's opinion was at all relevant times highly valued in hiring decisions, and he may recommend faculty, he does not have the authority to hire or fire faculty and did not make the hiring decision in question.

69.     Further, Mr. Wright ended their relationship on October 21, 2021, but the position was already filled on October 13, 2021, eight days prior to their relationship ending. This timeline makes Ms. Dorsey's retaliation claim false and frivilous.

70.     Ms. Dorsey also falsely alleged that Mr. Wright prevented her from securing the UVA fellowship funding. Notably, the University did not determine that it lacked jurisdiction over this allegation, despite it alleging conduct that occurred outside of its "education program or activity."

71.     Indeed, UVA is not within the "substantial control" of the University.

72.     Even after her Title IX complaint against him, Mr. Wright assisted in making sure Ms. Dorsey was paid for this fellowship.

73.     Indeed, Ms. Dorsey was paid for her UVA fellowship.

74.     No part of Mr. Wright's and Ms. Dorsey's relationship was "unwelcome" – a necessary element of any sexual harassment allegation. Ms. Dorsey herself proved that the relationship was not "unwelcome" by her vigorous protestations after Mr. Wright broke up with her. Obviously, if the relationship was "unwelcome" or at all coercive, Ms. Dorsey would have been elated to be free of the relationship. But she was not – she was heartbroken. That is because she loved Mr. Wright and her relationship with him, enthusiastically consenting to be with him.

75.     All of Ms. Dorsey's allegations to Title IX are false, and she made the allegations knowing them to be false.

76.     Further, all of Ms. Dorsey's allegations are predicated and contingent on her allegation that she ended the relationship – something that is proved false by her own text messages.

<u>The University's Response to Ms. Dorsey's False Complaint</u>

77.     The University notified Mr. Wright, on January 28, 2022, that it was opening a formal Title IX investigation pursuant to 34 C.F.R. §106.45 because Ms. Dorsey had filed a formal complaint.

78.     On that same day, the University's Title IX Office issued a "No Contact Order" prohibiting Mr. Wright and Ms. Dorsey from having direct or indirect contact with each other.

79.     In response to the formal complaint, the University embarked on a wide-ranging investigation to determine whether, among other things, Ms. Dorsey was the victim of sexual harassment eleven years ago, at the start of the romantic relationship.

80.     The investigation also sought to determine whether Mr. Wright interfered with Ms. Dorsey's professional opportunities (including at UVA).

81.     Although required to do so, the University did not dismiss Ms. Dorsey's allegation regarding the UVA fellowship, pursuant to 34 C.F.R. §106.45(b)(3)(i) and its own Policy 1202, even though UVA is not within the University's "substantial control."

82.     While the Title IX complaint was filed in December 2021, and the University notified Mr. Wright about it in January 2022, the University's appointed investigator did not interview Mr. Wright until mid-May 2022.

83.     This was Mr. Wright's first opportunity to share the truth of the matter.

84.     All of Ms. Dorsey's allegations to Title IX are false, and she made the allegations knowing them to be false.

85.     Further, all of her allegations are predicated and contingent on her allegation that she ended the relationship – something that is proved false by her own text messages.

86.     This investigation into Mr. Wright remains ongoing, nearly two years later.

<u>Mr. Wright's Complaint Against Ms. Dorsey</u>

87.     In the time it took for Mr. Wright to receive an interview, Ms. Dorsey had been busy. She had recruited Angela Landry to her cause, and the two of them embarked on a campaign to contact Mr. Wright's clients and tell them, falsely, that he sexually harassed them and other students.

88.     In response to her retaliation against him, on June 6, 2022, Mr. Wright submitted his own Title IX formal complaint to the University.

89.     Mr. Wright's complaint alleged that Ms. Dorsey had (1) retaliated against him; (2) sexually harassed him by contacting his clients and telling them falsely that he sexually harassed or assaulted her, and by her coming to Mr. Wright's office uninvited and berating him about their romantic relationship, and by calling

16

his girlfriend repeatedly; and that Ms. Dorsey had (3) violated the No Contact Order by contacting Mr. Wright's clients to harass and defame him, among other things.

90.    The University dismissed Mr. Wright's formal complaint in full without any investigation.

91.    In its dismissal notice, the University cited its permissive dismissal policy that allows for dismissal where "the Respondent is not enrolled or employed" at the University.

92.    This language tracks the permissive dismissal section of the Title IX regulations at 34 C.F.R. §106.45(b)(3)(ii). The University, however, went further than the regulation or its Policy and stated in its notice that because Ms. Dorsey was not "enrolled or employed," the University "has no *jurisdiction* to pursue the [formal] Complaint." (emphasis added).

93.    The University chose to dismiss Mr. Wright's formal complaint, therefore, on the sole ground that Ms. Dorsey was not "enrolled or employed." But Ms. Dorsey did, in fact, have some sort of employment relationship with the University – she had an arrangement to monitor an online LLM class at the University when that course was offered. A close reading of the dismissal notice suggests that the University knew that Ms. Dorsey was, in fact, employed in some manner, because the University noted that Ms. Dorsey was not an "*active* employee." (emphasis added).

94.  Neither the Title IX regulations nor the University Policy use the term "active employee." This term was created by the University for a one-time use – to dismiss Mr. Wright's formal complaint.

<u>The Defamation Campaign Metastasizes into Extortion</u>

95.  Because the University refused to investigate his claim of retaliation, Ms. Dorsey's harassment campaign continued and worsened.

96.  In a transparent attempt at extortion, and perhaps bolstered by the University's deliberate indifference to Mr. Wright's complaint, Ms. Dorsey and Ms. Landry eventually demanded a multi-million dollar payout from Mr. Wright and from the University.

97.  This demand was sent to Mr. Wright and to the University.

98.  Ms. Dorsey and Ms. Landry's seventeen-page "demand letter" contained a string-list of laws on the seventeenth page without any legal analysis.

99.  The "claims" it purported to settle were facially meritless. For example, it purported to settle a Title IX claim against Mr. Wright based on conduct allegedly occurring eleven years ago, whereas Virginia's two-year statute of limitations would apply. It also purported to settle a Title VII claim against Mr. Wright even though he is not an "employer" under the meaning of the statute because he does not employ fifteen or more employees, among other things. *See* 42 U.S.C. §2000e.

100.  Instead of any legal analysis, the so-called demand letter spent sixteen and a half pages calling Mr. Wright a predator or other names, purporting to be quotes from unnamed other women. The purpose of including these "quotes" from

18

unnamed individuals was to threaten Mr. Wright and the University with reputational destruction.

101.   Despite an ongoing Title IX investigation by the University into Ms. Dorsey's complaint against Mr. Wright for which he is supposed to be presumed not responsible, the University paid Ms. Dorsey to settle her alleged claims against it.

102.   When the University agreed to pay Ms. Dorsey, there had not been, and indeed still has not been, any finding by the University's Title IX Office that Mr. Wright was "responsible" for Ms. Dorsey's Title IX claims.

103.   Because it had been made clear to Mr. Wright through the University's actions that he was not going to receive any fair process at the University, Mr. Wright was forced to resign from his employment at the University.

104.   Although he submitted his resignation letter on June 26, 2023, his resignation was not effective until August 8, 2023.

### The University Doubles Down in its Support of Ms. Dorsey

105.   The same day that Mr. Wright's resignation took effect, Ms. Dorsey, the female complainant, went to the media to begin spreading their lies publicly.

106.   Over the next several weeks, Mr. Wright was subjected to near constant press inquiries and media articles labeling him a perpetrator of sexual harassment, because of the women's statements, including Ms. Dorsey's re-alleging of what she alleged in her formal complaint to the University's Title IX office. Ms. Dorsey also complained about the University's delay in adjudicating her complaint.

107.   In response to Ms. Dorsey's public statements, University administrators made their own statements capitulating to Ms. Dorsey and condemning Mr. Wright – in a clear showing of bias against Mr. Wright.

108.   For instance, on or about August 21, 2023, the Dean of the Law School, Dean Randall, sent an email to the entire student body addressing the allegations against Mr. Wright.

109.   In the email, Dean Randall, on behalf of the University, disclosed private employment records by stating he had put in place the restrictions on Mr. Wright's contact with students, which plainly implies that the University had considered Mr. Wright responsible for the allegations the entire time, even when it was required to presume him not responsible.

110.   The University acknowledged that this information was confidential, through its August 22, 2023 comments to Law360 from its Vice President for Media and Communications in which the University official is quoted, stating "The details of these types of measures in this instance are confidential because they relate to employment."

111.   Despite the confidentiality, it chose to disclose the records, demonstrating that the University would rather violate Mr. Wright's rights than risk bad press casting the University as unsupportive to the #metoo movement.

112.   In fact, before sending this email, Dean Randall called Mr. Wright and preemptively apologized for having to make a public statement against him. Dean

Randall told Mr. Wright that his "hands were tied" and that the Law School needed to make a statement because "they were getting killed by the press."

113.    Dean Randall also referenced misconduct allegations against Mr. Wright in an email to all alumni of the Law School on or about August 30, 2023, again kowtowing to the #metoo movement in a desperate attempt to avoid bad press.

114.    Dean Randall told all of the alumni of the Law School that, among other things, the Law School is "deeply concerned" by the allegations and is conducting a review of its Title IX process to ensure "a safe and welcoming environment for everyone." The clear message of the statement to any reader was that Mr. Wright did in fact commit conduct that was "deeply concerning."

115.    The University President also chimed in. He published at least one statement on or about August 28, 2023, that the University was reforming its policies and increasing Title IX training in response to allegations against Mr. Wright.

116.    In response to the media pressure, the University did, in fact, change its policies related to consensual relationships between students and employees. It banned those relationships outright, where it had not banned them before. This, among other things, demonstrated that the University was responsive to public pressure of the #metoo movement.

117.    Although the University's statements suggest that it was only made recently aware of the allegations, it knew about them by the end of 2021, when Ms. Dorsey submitted her Title IX complaint. The University did not make any attempt to change its policies until after it was subjected to public pressure. Only then did it

(1) falsely suggest that it was only recently made aware of the allegations, and (2) rapidly enact new policy.

118.   At the time each of the University administrators' statements were made, of course, the University was still investigating the allegations and was required to presume Mr. Wright "not responsible."

119.   Quite obviously, the University and its administration had given up on even the appearance of fairness and would instead do anything to please the women and those in the public sympathetic to them. The University decided that its own self-interest required discriminating against the male – Mr. Wright.

120.   In response to the now very public defamation, Mr. Wright sued Ms. Dorsey and Ms. Landry in this Court on August 24, 2023. This case is still pending.

121.   Approximately one week after Mr. Wright filed his lawsuit, on August 31, 2023, the University held an official event on campus titled "#MeToo at GMU" featuring the female complainant as a main speaker, to talk about her accusations against Mr. Wright. See Exhibit A.

122.   If there was any doubt remaining that the University would do anything to comply with the #metoo movement and its inherent bias against men, this event dispels that doubt.

123.   Accordingly, at the time the University was supposed to presume Mr. Wright "not responsible," it gave his female accusers an official platform to spread their false allegations against Mr. Wright and publicly demonstrating the University's support of the female complaint.

124.    The University did not stop its public support there. Shockingly, on September 14, 2023, the University released a public statement thanking the female complainant by name.

125.    The University stated, among other things, "Mason can share that these **brave women courageously** came forward to bring **allegations of sexual misconduct** to the university's attention. Mason is **proud to count Ms. Dorsey and Ms. Landry** as alumni."[4]

126.    The press release concluded by stating that "Mason condemns any attempt to silence or intimidate individuals from making good faith complaints of misconduct through the University's processes."

127.    This statement is a thinly veiled condemnation of Mr. Wright's lawsuit.

128.    In other words, as it did with its public statements condemning Mr. Wright while there was a pending Title IX complaint by Ms. Dorsey at the University, the University publicly praised her for coming forward, essentially accepting her facts as true before any hearing, and while it was required to presume Mr. Wright "not responsible," thereby, again, publicly placing its finger on the scale in favor of the female complainant.

129.    After Mr. Wright protested to the University regarding its actions in publicly condemning him and praising the female complainant, the University, in a serpentine manner, assured him that he was still presumed not responsible despite

---

[4] *Strengthening systems to prevent and respond to employee misconduct*, GEORGE MASON UNIVERSITY (Sept 14, 2023), https://www.gmu.edu/news/2023-09/strengthening-systems-prevent-and-respond-employee-misconduct.

these public statements in support of the "bravery" and "courage" of his accusers and the condemnation of his lawsuit, which the University also declared it would investigate as retaliation, as discussed in more detail below.

130.    By publicly supporting the female complainant, the University placed its proverbial thumb on the scale in favor of the female at the expense of the male in its *ongoing Title IX process.*

131.    As a result of these statements, any University hearing officer would not feel free to make his or her own determination and would be pressured by his or her employer to find Mr. Wright responsible.

The University Retaliates against Mr. Wright to Appease the Female Complainant

132.    In response to Mr. Wright's lawsuit, Ms. Dorsey filed an amended Title IX complaint, alleging that Mr. Wright's lawsuit constituted retaliation under Title IX and the University's Policy.

133.    In stark contrast to its dismissal of Mr. Wright's formal complaint, the University, through Defendant Bluestein, accepted Ms. Dorsey's amended complaint and issued a new notice to Mr. Wright on September 7, 2023. The University charged Mr. Wright with retaliation because he filed his lawsuit.

134.    By sending the September 7, 2023 notice to Mr. Wright, the University revealed that it had determined that Ms. Dorsey's amended complaint alleged conduct occurring within its "education program or activity." In other words, the University had found that it exercised "substantial control" over both Mr. Wright (who had resigned several months prior and was effective approximately a month

24

prior) and this Court, where the filing of the lawsuit took place. In short, the amended notice told Mr. Wright that the University was preparing to punish him for the exercise of his right to access the Court.

135.   The amended notice also showed that while the University would dismiss Mr. Wright's complaint because Ms. Dorsey was not "enrolled or employed," a different rule would apply to Mr. Wright. Even though Mr. Wright was not "enrolled or employed" at the time of filing Ms. Dorsey's amended complaint, the University would refuse to dismiss the amended complaint.

136.   In response to the amended notice seeking to punish Mr. Wright for filing a lawsuit, Mr. Wright sent a letter to the University, through counsel, raising his concerns that investigating him for filing a lawsuit would (1) unconstitutionally chill his First Amendment right to petition his government for a redress of grievances; (2) violate the Title IX regulations by expanding the "education program or activity" of the University to include a court of law, something that is patently absurd; and (3) demonstrates bias against Mr. Wright on the basis of sex because the University would permit a complaint to proceed against a male non-employee but not a female non-employee (assuming, of course, that Ms. Dorsey was in fact not an employee at the time of Mr. Wright's filing of a formal complaint, a fact that the University's use of the term "active employee" makes dubious).

137.   In response to this letter, the University stated that it would use a higher standard for the female complainant's retaliation claim rather than

dismissing as required under the Title IX regulations because this Court is not within the University's "substantial control."

138.   When pressed about the First Amendment concerns, the University offered that Mr. Wright could seek court relief.

139.   Unsurprisingly, the University refused to dismiss the amended complaint and stated that it would proceed against Mr. Wright regardless of his concerns.

140.   Later, Defendant Bluestein placed the University's position in writing. In an email to Mr. Wright on October 4, 2023, Defendant Bluestein stated that the Hearing Officer, who may or may not be an attorney according to the University's Policy, will analyze federal case law as argued by the parties to determine whether a First Amendment privilege applies at the University hearing.

141.   The University's Policy, however, states that the Hearing Officer's role is merely to "make a determination of responsibility (responsible or not responsible) for the alleged violations of Policy 1202 stated in the Formal Complaint." The Policy does not permit the University Hearing Officer to usurp the role of a judge, and it does not empower the Hearing Officer to make any decisions of law – the Hearing Officer's only role is to apply University Policy.

142.   Defendant Bluestein further stated in the email that Mr. Wright may be subject to punishment if the Hearing Officer determines that his lawsuit does not have a "reasonable" basis in fact and law, which is not the First Amendment test.

143.    In other words, the University bent over backwards, including bucking its own policy, the Title IX Regulations, and the First Amendment, to let the female complainant's claim for retaliation based upon Mr. Wright's lawsuit against her proceed despite it requiring its hearing officer, who may not even be an attorney, make First Amendment determinations.

144.    The University's position is asinine on its face and showcases bias. Typically, students appear *pro se* in these proceedings, and the Hearing Officer is not guaranteed to be an attorney. Its position would require any non-lawyer staff or faculty member to analyze caselaw and render a legal decision (perhaps committing the unauthorized practice of law). Accordingly, it would presumably require an eighteen-year-old freshman to present legal arguments themselves, if it applied this policy University-wide.

145.    The University, through Defendant Bluestein, also reiterated in this email that the University would not dismiss its amended complaint against Mr. Wright.

146.    As of October 4, 2023, the University's appointed investigator began investigating Mr. Wright as to the amended complaint – *i.e.,* whether his civil suit for defamation was a Title IX retaliation violation at the University.

147.    Given that the University made public statements praising his female accusers and condemning him, paid his false accusers $475,000, and dismissed his complaints while allowing Ms. Dorsey's to proceed, Mr. Wright will not receive a fair hearing.

148.   The University will find him responsible regardless of the weight of the evidence, consistent with its self-interest to avoid bad press or an investigation from the Department of Education.

149.   Further, any reasonable person would be deterred from filing a lawsuit by a government agency threatening retaliation. While Mr. Wright did not dismiss his lawsuit in response to the University's prosecution against him, other reasonable employees or former employees might be deterred from exercising their First Amendment right to petition.

150.   When the University finds against Mr. Wright, consistent with its predetermined outcome, it will do enormous damage to his career and ability to secure employment. While his prospects have narrowed considerably after his false accusers' defamation, a formal determination by a government agency that he committed sexual misconduct will extinguish what hope he has left to make a living.

## CAUSES OF ACTION

### COUNT I
### TITLE IX – DELIBERATE INDIFFERENCE
### (Against Defendant University)

151.   Mr. Wright incorporates the above paragraphs by reference.

152.   Title IX prohibits all discrimination on the basis of sex in education.

153.   This prohibition includes discrimination that takes the form of deliberate indifference to sexual harassment.

154.   Deliberate indifference sexual harassment includes four elements: (1) that the educational institution receives federal funds; (2) that the plaintiff was

28

subjected to harassment based on [his] sex; (3) that the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity; and (4) that there is a basis for imputing liability to the institution.

155.   The University receives federal funds.

156.   By slandering Mr. Wright as a perpetrator of sexual harassment, Ms. Dorsey subjected Mr. Wright to harassment on the basis of his sex.

157.   The harassment has been sufficiently severe and pervasive because the harassment was widespread at the University and in the general public.

158.   There is a basis to impute liability to the University because the University had actual knowledge of the harassment and acted clearly unreasonably in light of the known circumstances by dismissing his complaint without any investigation.

159.   The University failed to act in a manner reasonably calculated to end the harassment, as required by law. It took no action whatsoever to protect Mr. Wright. Instead, it made public statements in support of his harassers and publicly condemned his attempt to seek relief from the Court.

160.   As a direct result of the University's deliberate indifference to the harassment he endured, Mr. Wright suffered and continues to suffer damages.

## COUNT II
## TITLE IX – SELECTIVE ENFORCEMENT
### (Against Defendant University)

161.  Mr. Wright incorporates the above paragraphs by reference.

162.  Title IX prohibits universities that receive federal funding from treating similarly situated persons differently on the basis of sex.

163.  Universities may be held liable for violating Title IX under a selective enforcement theory where the severity of the sanctions or the decision to initiate charges was caused by the person's sex.

164.  Selective enforcement claims generally require a showing of a similarly situated person of the opposite sex being treated more favorably by the University.

165.  Mr. Wright and Ms. Dorsey were similarly situated because they both filed Title IX formal complaints alleging retaliation and sexual harassment. Only Ms. Dorsey's complaint was accepted and opened for investigation.

166.  Whereas the University indicated to Mr. Wright that it had no "jurisdiction" to pursue his formal complaint because Ms. Dorsey was not "enrolled or employed," it pursued Ms. Dorsey's formal complaint against Mr. Wright even though he was not "enrolled or employed."

167.  This disparate treatment was caused by Mr. Wright's sex.

168.  Therefore, the University selectively enforced its Title IX policy and is liable under Title IX.

169.  As a direct result of the University's selective enforcement, Mr. Wright suffered and continues to suffer damages.

<u>COUNT III</u>
**TITLE IX –** *Sheppard* **Claim**
**(Against Defendant University)**

170.   Mr. Wright incorporates the above paragraphs by reference.

171.   Title IX prohibits all discrimination on the basis of sex in educational institutions that receive federal funding.

172.   The University receives federal funding.

173.   The Fourth Circuit interprets Title IX to bar discipline in educational institutions subject to Title IX where the plaintiff's sex is a but-for cause of the discipline.

174.   Not only is Mr. Wright imminently going to be disciplined by the University, but the University has also already made public statements in support of his female accusers and against him, despite purporting to presume him not responsible for the allegations against him. These statements have a similar effect to publicly and officially disciplining him.

175.   The University's treatment of Mr. Wright is caused by Mr. Wright's male sex. This is evidenced by (1) its use of inconsistent reasoning to explain its refusal to investigate his formal complaint while accepting the female's formal complaints; (2) its use of the term "active employee" to reject Mr. Wright's complaint, where that phrase appears nowhere in Title IX or the University's Policy; (3) its public statements condemning him and in support of his female accusers, in the middle of the Title IX process; (4) its instruction that its Hearing Officer would apply First Amendment caselaw and make a legal ruling, where its Hearing Officers are not

empowered to do so under University Policy; and (5) its willful violation of the Title IX regulations, among other things. On the whole, the University has shown it will do anything to side with the female and against the male, even if it means mutilating its Policy and Title IX beyond recognition, going so far as to claim "substantial control" over this Court.

176.   The University's disparate treatment of Mr. Wright is set against the backdrop of federal pressure from the Department of Education and by pressure in the media about the Title IX case. The University therefore feels immense pressure to side with the female and has succumbed to that pressure.

177.   As a result of the University's violation of Title IX, Mr. Wright continues to suffer damages.

### COUNT IV
### VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### Via 42 U.S.C. §1983
### (Against Defendant Bluestein in his individual capacity)

178.   Mr. Wright incorporates the above paragraphs by reference.

179.   The University is a public entity and an agency of the government of Virginia.

180.   During the relevant time period, Defendant Bluestein exercised the final authority of the University's Title IX Office.

181.   The University, evidently, has a practice of investigating complaints by females and ignoring complaints by males.

182.  The University investigated Ms. Dorsey's complaint against Mr. Wright but did not investigate Mr. Wright's complaint against Ms. Dorsey, evidencing a bias towards females and against males.

183.  Mr. Wright was treated differently from Ms. Dorsey by the University throughout the relevant time period because, among other things, his complaint was not investigated and the harassment he reported was not remedied, whereas Ms. Dorsey's amended complaint was accepted and opened for investigation.

184.  This disparate treatment was caused by discrimination on the basis of sex.

185.  Such differential treatment on the basis of sex cannot be justified by intermediate scrutiny because, among other things, there is not a legitimate governmental objective served by ignoring male faculty's complaints of harassment and retaliation while accepting the female's complaints of harassment and retaliation.

186.  Mr. Wright requests compensatory and incidental damages, including emotional damages, from Defendant Bluestein, who was knowingly responsible for this disparate treatment.

### COUNT V
**VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
Via 42 U.S.C. §1983
(Against Defendant Bluestein in his official capacity)**

187.  Mr. Wright incorporates the above paragraphs by reference.

188.   The University is a public entity and an agency of the government of Virginia.

189.   During the relevant time period, Defendant Bluestein exercised the final authority of the University's Title IX Office.

190.   The University, evidently, has a practice of investigating complaints by females and ignoring complaints by males.

191.   The University investigated Ms. Dorsey's complaint against Mr. Wright but did not investigate Mr. Wright's complaint against Ms. Dorsey, evidencing a bias towards females and against males.

192.   Mr. Wright was treated differently from Ms. Dorsey by the University throughout the relevant time period because, among other things, his complaint was not investigated and the harassment he reported was not remedied, whereas Ms. Dorsey's amended complaint was accepted and opened for investigation.

193.   This disparate treatment was caused by discrimination on the basis of sex.

194.   Such differential treatment on the basis of sex cannot be justified by intermediate scrutiny because, among other things, there is not a legitimate governmental objective served by ignoring male faculty's complaints of harassment and retaliation while accepting the female's complaints of harassment and retaliation.

195.   Mr. Wright requests injunctive relief in the form of an order directing Defendant Bluestein to dismiss Ms. Dorsey's amended complaint.

<u>COUNT VI</u>
**VIOLATION OF THE PETITION CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION**
**Via 42 U.S.C. §1983**
**(Against Defendant Bluestein in his individual capacity)**

196.    Mr. Wright incorporates the above paragraphs by reference.

197.    During the relevant time period, Defendant Bluestein exercised the final authority of the University's Title IX Office.

198.    The First Amendment to the United States Constitution protects a citizen's right "to petition the government for a redress of grievances." U.S. Const. Amend. I. In other words, it protects the citizenry's right to access the court system, among other things.

199.    Under the First Amendment, the government may not punish a citizen for filing a lawsuit, unless the lawsuit is utterly baseless or filed with knowledge of its falsity.

200.    The government, through Defendant Bluestein, threatened Mr. Wright with punishment because he filed a lawsuit against Ms. Dorsey and Ms. Landry, two other private citizens.

201.    The government cannot show that Mr. Wright's lawsuit is utterly baseless or filed with knowledge of its falsity; and in any event, the government applies the wrong test. It told Mr. Wright that it would punish him if his lawsuit lacked a "reasonable" basis in fact and law, which is a higher bar than the First Amendment permits, and the word "reasonable" permits the government Hearing

Officer to apply his or her own subjective view of whether they agree with Mr. Wright's lawsuit.

202.   Mr. Wright's lawsuit is only at the pleading stage, and therefore, even if the University were to apply the "reasonable" basis standard, it is unclear how it could possibly determine whether the lawsuit lacked a "reasonable" basis in fact and law before this Court could render any decision on the merits and without such a decision from the Court. And yet, that is what the University plans to do.

203.   While Mr. Wright's lawsuit does indeed have a reasonable basis in fact and law (he attached exhibits to his complaint in this Court), the fact that the University is attempting to apply a "reasonable" standard shows its contempt for the First Amendment.

204.   Finally, because even unsuccessful but reasonably based suits advance some First Amendment interests, even if Mr. Wright's lawsuit were ultimately dismissed or unsuccessful, that alone would not show utter baselessness such that government retaliation would be appropriate.

205.   The government's charging of Mr. Wright with retaliation because he petitioned the court produces an unconstitutional "chilling effect" on protected First Amendment activity even absent any finding of responsibility, because the charge of retaliation is an official threat of enforcement made specifically against Mr. Wright.

206.   Mr. Wright requests compensatory and incidental damages, including emotional damages, from Defendant Bluestein, who was knowingly responsible for the violation of Mr. Wright's right to petition.

## COUNT VII
## VIOLATION OF THE PETITION CLAUSE OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION
### Via 42 U.S.C. §1983
### (Against Defendant Bluestein in his official capacity)

207.    Mr. Wright incorporates the above paragraphs by reference.

208.    During the relevant time period, Defendant Bluestein exercised the final authority of the University's Title IX Office.

209.    The First Amendment to the United States Constitution protects a citizen's right "to petition the government for a redress of grievances." U.S. Const. Amend. I. In other words, it protects the citizenry's right to access the court system, among other things.

210.    Under the First Amendment, the government may not punish a citizen for filing a lawsuit, unless the lawsuit is utterly baseless or filed with knowledge of its falsity.

211.    The government, through Defendant Bluestein, threatened Mr. Wright with punishment because he filed a lawsuit against Ms. Dorsey and Ms. Landry, two other private citizens.

212.    The government cannot show that Mr. Wright's lawsuit is utterly baseless or filed with knowledge of its falsity; and in any event, the government applies the wrong test. It told Mr. Wright that it would punish him if his lawsuit lacked a "reasonable" basis in fact and law, which is a higher bar than the First Amendment permits, and the word "reasonable" permits the government Hearing

Officer to apply his or her own subjective view of whether they agree with Mr. Wright's lawsuit.

213.   Mr. Wright's lawsuit is only at the pleading stage in his lawsuit, and therefore, even if the University were to apply the "reasonable" standard, it is unclear how it could possibly determine whether the lawsuit lacked a "reasonable" basis in fact and law before this Court could render any decision on the merits and without such a decision from the Court. And yet, that is what the University plans to do.

214.   While Mr. Wright's lawsuit does indeed have a reasonable basis in fact and law (he attached exhibits to his complaint in this Court), the fact that the University is attempting to apply a "reasonable" standard shows its contempt for the First Amendment.

215.   Finally, because even unsuccessful but reasonably based suits advance some First Amendment interests, even if Mr. Wright's lawsuit were ultimately dismissed or unsuccessful, that alone would not show utter baselessness such that government retaliation would be appropriate.

216.   The government's charging of Mr. Wright with retaliation because he petitioned the court produces an unconstitutional "chilling effect" on protected First Amendment activity even absent any finding of responsibility, because the charge of retaliation is an official threat of enforcement made specifically against Mr. Wright.

217.   Mr. Wright requests injunctive relief in the form of an order directing Defendant Bluestein to dismiss Ms. Dorsey's amended complaint.

<u>COUNT VIII</u>
## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION
### (Via 42 U.S.C. §1983)
### (Against Defendant Bluestein in his official capacity)

218.    Mr. Wright incorporates the above paragraphs by reference.

219.    The Fourteenth Amendment to the United States Constitution protects a citizen's procedural due process rights; the government may not deprive a citizen of his interest in his life, liberty, or property, without due process of law.

220.    Due process of law requires that the accused be provided notice of any charges and an opportunity to be heard.

221.    Mr. Wright has a liberty interest in his professional reputation and his ability to pursue his occupation of choice.

222.    The government harmed Mr. Wright's professional reputation and his ability to pursue his occupation of choice by making public statements in support of his female accusers and in condemnation of him.

223.    When the government made these statements, Mr. Wright was not yet given an opportunity to be heard. He had not been provided the opportunity for any hearing and had not even been interviewed on the new retaliation charge.

224.    The government made these statements in connection with an official act that altered Mr. Wright's legal status – it charged him with retaliation.

225.    Mr. Wright was therefore deprived of his right to due process, and requests injunctive relief in the form of an order directing the recission of the government's statements against him.

## COUNT IX
## BREACH OF CONTRACT
### (Against Defendant University)

226.   Mr. Wright incorporates the above paragraphs by reference.

227.   Mr. Wright had an employment contract with the University.

228.   That employment contract incorporated by reference the University policies and procedures, including those that relate to Title IX.

229.   The University breached its own Policy (and thus, the contract) by, among other things, (1) prosecuting a retaliation complaint against Mr. Wright for filing a lawsuit where this Court is very clearly not within the University's "substantial control," a finding that is required to pursue a Title IX matter at the University under its Policy; (2) the University's use of the term "active employee" to reject Mr. Wright's complaint, where that phrase appears nowhere in the Policy; (3) its public statements condemning him and in support of his female accusers, in the middle of the Title IX process, where the University is required by the Policy to presume Mr. Wright not responsible; and (4) its instruction that its Hearing Officer would apply First Amendment caselaw and make a legal ruling, where its Hearing Officers are not empowered to do so under University Policy, among other things.

230.   As a result of the University's breach, Mr. Wright continues to suffer damages.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Joshua Wright, by counsel, demands judgment against Defendants, George Mason University and Thomas Bluestein, as follows:

a. An award of compensatory, special, and punitive damages, in an amount to be determined at trial;

b. Injunctive relief as delineated above;

c. An award of Plaintiff's costs associated with this action, including but not limited to his reasonable attorneys' fees and expenses, under the common law and 42 U.S.C. §1988; and

d. Such other and further relief that this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff Joshua Wright demands a trial by jury on all issues triable.

Dated: November 30, 2023

JOSHUA WRIGHT
*By Counsel*

Respectfully submitted,

Benjamin F. North, VSB No. 97439
Lindsay R. McKasson, VSB No. 96074
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
T: (703) 888-1943
F: (703) 888-1930
ben@binnall.com
lindsay@binnall.com

*Attorneys for Plaintiff*

**EXHIBIT A**



## FAIRFAX CIRCUIT COURT
## CIVIL CASE COVERSHEET

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. JOSHUA WRIGHT | 1. THE RECTOR AND VISITORS OF GEORGE MASON UNIVERSITY |
| 2. | 2. THOMAS BLUESTEIN |
| 3. | 3. |

**\*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint**

**Plaintiff Attorney:**

| | |
|---|---|
| Name: BENJAMIN F. NORTH | Bar ID: 97439 |
| Firm: BINNALL LAW GROUP | |
| Street: 717 KING STREET, SUITE 200 | |
| City: ALEXANDRIA    State: VA    Zip: 22314 | |
| Phone Number: (703) 888-1943 | Fax Number: (703) 888-1930 |
| E-mail Address: BEN@BINNALL.COM | |

**Nature of Complaint** (Check only one)       **\* Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| Administrative Appeal | Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| Complaint – Equity  * | Garnishment–Federal–180 days | Products Liability* |
| ☒ Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction  * | Injunction | Writ Habeas Corpus |
| Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | **OTHER:** |
| Declaratory Judgment * | Malpractice – Legal * | |

**Damages in the amount of $** 1,000,000 **are claimed.**

**Requested Service:**  Sheriff☐  Private Process Server☐  DMV☒  Secretary of Commonwealth☐
State Corporation Commission☐  Publication☐  No Service at this time☐