# EXHIBIT E

## FAIRFAX CIRCUIT COURT
## CIVIL CASE COVERSHEET

**2023  12232**

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. Joshua Wright | 1. Elyse Dorsey |
| 2. | 2. Angela Landry |
| 3. | 3. |

**\*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint**

**Plaintiff Attorney:**

Name: **Jason Greaves**                    Bar ID: 86164

Firm: **Binnall Law Group**

Street: **717 King Street, Suite 200**

City: **Alexandria**        State: **VA**    Zip: **22314**

Phone Number: **(703) 888-1943**        Fax Number: **(703) 888-1930**

E-mail Address: **jason@binnall.com**

**Nature of Complaint** (Check only one)        **\* Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| ☐ Administrative Appeal | ☒ Defamation \* | ☐ Malpractice – Medical \* |
| ☐ Affirmation of Marriage | ☐ Delinquent Taxes \* | ☐ Mechanics/Vendors Lien \* |
| ☐ Aid & Guidance | ☐ Eminent Domain | ☐ Partition \* |
| ☐ Appeal Decision of Board of Zoning | ☐ Encumber/Sell Real Estate | ☐ Personal Injury – Assault \* |
| ☐ Appeal of Process/Judicial Appeal | ☐ Erroneous Assessments | ☐ Personal Injury – Auto \* |
| ☐ Appointment Church/Organization Trustees | ☐ Expungement | ☐ Personal Injury – Emotional \* |
| ☐ Arbitration | ☐ False Arrest/Imprisonment\* | ☐ Personal Injury – Premises Liability\* |
| ☐ Attachment | ☐ Fiduciary/Estate Complaint | ☐ Property Damage\* |
| ☐ Complaint – Equity  \* | ☐ Garnishment–Federal–180 days | ☐ Products Liability\* |
| ☐ Complaint – Legal Cause of Action \* | ☐ Garnishment–Wage–180 days | ☐ Quiet Title \* |
| ☐ Compromise Settlement | ☐ Garnishment–Other – 90 days | ☐ Real Estate \* |
| ☐ Condemnation\* | ☐ Guardian/Conservator Adult | ☐ Restoration of Driving Privilege |
| ☐ Confession of Judgment | ☐ Guardianship/Minor | ☐ Vital Record Correction |
| ☐ Construction  \* | ☐ Injunction | ☐ Writ Habeas Corpus |
| ☐ Contract \* | ☐ Interpleader | ☐ Writ Mandamus |
| ☐ Conversion\* | ☐ Insurance \* | ☐ Wrongful Death\* |
| ☐ Court Satisfaction of Judgment | ☐ Judicial Review | ☐ Wrongful Discharge \* |
| ☐ Declare Death | ☐ Malicious Prosecution \* | ☐ OTHER: |
| ☐ Declaratory Judgment \* | ☐ Malpractice – Legal \* | |

**Damages in the amount of $ 108,000,000** are claimed.

**Requested Service:** Sheriff ☒ Private Process Server ☐ DMV ☐ Secretary of Commonwealth ☐ State Corporation Commission ☐ Publication ☐ No Service at this time ☐

V I R G I N I A :

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
CIVIL INTAKE

2023 AUG 24  A 10: 02

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | | |
|---|---|---|
| JOSHUA WRIGHT, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | |
| v. | ) | Case No.  **2 0 2 3   1 2 2 3 2** |
| | ) | |
| ELYSE DORSEY, | ) | |
| 6147 Beachway Drive | ) | |
| Falls Church, Virginia 22041, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ANGELA LANDRY, | ) | |
| 6857 Grande Lane | ) | |
| Falls Church, Virginia 22043, | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## COMPLAINT

Defendants Elyse Dorsey and Angela Landry, both scorned, former lovers and law students of Plaintiff Joshua Wright, have embarked on a vendetta to destroy his reputation, portray themselves as #metoo victims, and make a fortune in the process. Their malicious lies have caused enormous damage. First, they targeted his employers and his clients, and threatened further reputational destruction if he did not pay them several million dollars. When he refused, they went to the press, claiming in a Law360 article that they submitted to romantic partnership with Mr. Wright because they felt pressured and fearful of retaliation, and portrayed him as a sexual predator. In well-documented reality, however, Defendants both pursued Mr. Wright at various times over the last decade, they had consensual, adult relationships

with him, and when those relationships ended, both were heartbroken because they had strong feelings for him.

Defendants have been devastatingly effective in their coordinated campaign to destroy Mr. Wright's reputation. He files this lawsuit to hold them accountable for their lies. In support of his Complaint, Mr. Wright states as follows:

## JURISDICTION

1.    All tortious conduct occurred in Fairfax County, Virginia, and thus jurisdiction in this Court is proper.

## THE PARTIES

2.    Plaintiff Joshua Wright is a Virginia resident residing in Fairfax County. Mr. Wright was a law professor at George Mason University ("GMU") and is now a lawyer in private practice.

3.    Defendant Elyse Dorsey is a Virginia resident residing at 6147 Beachway Dr., Falls Church, Virginia 22041. Defendant Dorsey is a partner at the major international law firm of Kirkland & Ellis LLP.

4.    Defendant Angela Landry is a Virginia resident residing at 6857 Grande Ln., Falls Church, Virginia 22043. Defendant Landry is counsel at the major international law firm of Freshfields Bruckhaus Deringer.

## THE FACTS

### Mr. Wright's Background

5.    Mr. Wright is an attorney. He became a law professor at GMU in 2004. He resigned from that position in the summer of 2023.

6.    Throughout his time teaching, GMU and others have repeatedly recognized the care and dedication he offers his students.

7.    During his nearly twenty years at GMU, Mr. Wright supervised more than one hundred research assistants and taught thousands of students.

8.    GMU Law promoted Mr. Wright to Assistant Professor in 2005, Associate Professor in 2010, and Professor of Law in 2011. Wright was recognized with the University-wide distinction of University Professor in 2016.

9.    In 2014, the Federalist Society awarded Mr. Wright the Paul M. Bator Award, a national award given annually to a law professor under the age of 40 who has "demonstrated excellence in legal scholarship, a commitment to teaching, a concern for students, and who has made a significant public impact."

10.    Over the years, Mr. Wright left his position at GMU intermittently to enter public service at the Federal Trade Commission (FTC), including as FTC Commissioner.

11.    While employed as a law professor at GMU, Mr. Wright also had various positions in private law practices and managed his own consulting business. He also served as the Executive Director of the Global Antitrust Institute at GMU.

**Defendant Dorsey's Long History with Mr. Wright**

12.    While teaching at GMU, Mr. Wright met Defendant Dorsey. Eventually, they began a romantic relationship. Both were married at the time and were aware of each other's marital status.

13.    Mr. Wright and Ms. Dorsey maintained a close relationship over the next eleven years, sometimes in a romantic capacity and sometimes not, but always as close friends and colleagues. Throughout that time, and regardless of the status of the romantic component of their relationship, Mr. Wright always supported Defendant Dorsey's career.

14.    When Defendant Dorsey left law school in 2012, Mr. Wright wrote a letter of recommendation for her to clerk at a federal court. When Defendant Dorsey finished with her clerkship, Mr. Wright helped her secure interviews with several firms, including Wilson Sonsini Goodrich & Rosati, where she accepted a position.

15.    At various points throughout their on-and-off relationship, Defendant Dorsey asked for help because she wanted to leave antitrust private practice. Mr. Wright, continuing to support her in any way he could, helped her interview with different "think tanks," as well as government agencies, including for key positions at the FTC and the Antitrust Division of the Department of Justice (DOJ).

16.    Defendant Dorsey successfully secured positions at the FTC and the DOJ.

17.    When Defendant Dorsey left the DOJ, she again sought career advice from Mr. Wright—she was unsure if she wanted to enter academia, move to an in-house counsel position, return to private practice, or go to graduate school. In response, Mr. Wright set up opportunities for her to talk to academics, created and raised funds for an academic fellowship at University of Virginia, and made a variety of calls supporting her for in-house jobs (including Amazon).

18.     Indeed, in 2020 through 2021, he helped her obtain the fellowship with UVA, and she even took on consulting work for Mr. Wright's firm as an independent contractor to help her financially while waiting for her fellowship at UVA to begin.

19.     Mr. Wright and Defendant Dorsey also published academic papers together (at least six over the course of four years) and worked together at GMU and elsewhere.

20.     During the course of their relationship, the two traveled together dozens of times.

21.     Outside of their romantic and professional relationship, the two always maintained an intimate friendship. In 2021, Defendant Dorsey confided in Mr. Wright about personal matters such as finding out her father was not her birth father and her feelings of loss after her aunt passed away. She told Mr. Wright then that "you're the person I want to talk to for everything good and bad."

22.     Defendant Dorsey also confided in Mr. Wright, on two separate occasions, that she had been sexually assaulted by two different members of the antitrust bar. Mr. Wright believed her at the time.

23.     Eventually, in late October 2021, Mr. Wright ended the off-an-on romantic relationship with Defendant Dorsey in a text message, telling her that he was seeing another woman. He also told her who it was.

24.     The other woman—who is now Mr. Wright's live-in girlfriend—was not just any *other woman*. Defendant Dorsey had previously worked with her at the same firm. During that period, Mr. Wright and this other woman had been in a romantic

relationship. Defendant Dorsey knew about the relationship at the time, which overlapped with her own romantic relationship with Mr. Wright—and she hated her.

25.    Defendant Dorsey was incensed. She immediately responded in text message, "WHAT THE ACTUAL FUCK" and "you know I deserve more than a fucking text right now." **Exhibit A**.

26.    She proceeded to send a series of angry text messages, including:

a. "You *promised* me multiple times you would be here. But you're doing the opposite – you're abandoning me, in the worst possible way. That's straight fucked up"

b. "And I'm so embarrassed for thinking you ever respected me, let alone love me."

c. "I didn't think I could hurt this much."

d. "You're being so mean to me and IDK why."

e. "IDK what I've done so wrong in my life to end up in this total dumpster fire right now. Or why I'm so expendable to you. That you seem to keep going out of your way to hurt me."

f. "I need you, at a minimum, to call me, bc [sic] right now, I could not possibly think less of you. You say you're all about loyalty – show it. Right now, for once."

g. She concluded with her disdain for the other woman: "I mean, I get you not wanting to see me. But you're going back to [her] – after how horribly

she's treated you, your family, everyone you *say* you care about …

Jesus Christ."

27.    Within days of sending the above text messages, Defendant Dorsey came uninvited to the law school, waited outside one of Mr. Wright's classes, and then followed him to his office.

28.    Once in his office, she loudly yelled at him regarding the end of their relationship and demanded to have a conversation with him. Several people overheard her yelling.

29.    After Mr. Wright refused to have a further conversation with her, Defendant Dorsey repeatedly tried to contact Mr. Wright's girlfriend with several calls and text messages, which were unwelcome by Mr. Wright's girlfriend.

30.    Defendant Dorsey also repeatedly contacted Mr. Wright's assistant in an attempt to reach Mr. Wright or to disparage him.

31.    Ultimately, this persistent and aggressive conduct made Mr. Wright fearful for his safety and his children's safety, as Defendant Dorsey had proven herself to be extremely erratic and unpredictable.

32.    Defendant Dorsey's conduct persisted and worsened.

**Defendant Dorsey's Vindictive Crusade to Destroy Mr. Wright**

33.    In retaliation for the breakup, Defendant Dorsey embarked on a pre-meditated plan to ruin Mr. Wright's life.

34.    Having been one of Mr. Wright's closest confidants and a lover for over a decade, and having insider knowledge of his employment and his major clients, she knew exactly where and how to hurt him professionally and reputationally.

35.    Within two months of the breakup, she filed a false Title IX complaint against him with GMU on December 12, 2021.

36.    In it, Defendant Dorsey told horrific and obvious lies of sexual harassment to the Title IX Office; the facts of their longstanding—obviously consensual—relationship be damned.

37.    Defendant Dorsey portrayed Mr. Wright in her Title IX complaint as a sexual predator and herself as a victim. Given their decade-long history, their traveling the world together, and their sharing the most intimate details of their lives, including both of their prior marriages, these allegations were patently ridiculous. Defendant Dorsey also falsely stated to the Title IX office that after *she* ended the relationship with Mr. Wright, he took adverse actions against her to retaliate for her terminating the relationship.  As shown by the text messages, and the fact that he never took—or even had the power to take—the retaliatory actions she alleged, this was also a malicious lie.

### Defendant Landry Joins the Crusade

38.    Next, Defendant Dorsey attempted to recruit other former girlfriends of Mr. Wright to join her crusade. She successfully recruited Defendant Landry.

39.     Multiple women have informed Mr. Wright that Defendant Dorsey or Defendant Landry, or both, have tried to recruit them to falsely accuse him of sexual misconduct.

40.     Defendant Landry, like Defendant Dorsey, had engaged in a consensual sexual relationship with Mr. Wright that began at some point between 2009 and 2012 (during which period Defendant Landry was already in a long-term relationship). It ended in 2012, and then resumed in 2015 when Defendant Dorsey took a job at the FTC. Defendant Landry left the FTC in September 2015 to join a prestigious, international law firm, while her relationship with Mr. Wright continued into 2016.

41.     When the relationship ended, also like Defendant Dorsey, Landry did not take it well. In a series of texts in December 2016, Defendant Landry tells Mr. Wright: "YOU were the one who told me you didn't want to be with me after five years . . . . you were what I wanted and you couldn't be with me". **Exhibit B.**

42.     Despite this bad breakup, Defendant Landry apparently decided to remain on good terms, and even reached out to Mr. Wright when she was having professional difficulties. In January 2019, when Defendant Landry was apparently being pushed out of her law firm, she sent Mr. Wright emails confiding in him and seeking his help. She wrote, among other things:

> "Hey Josh — Still trying to wrap my head around all this... I hope you don't mind me leaning on you right now. Your support and advice mean everything to me. . . .
>
> Also, I'd like to talk to you about the GAI position that's open. I've been thinking for a long time about asking you if there was any potential for me to work there, and I saw your tweet the other day that there actually is an opening. Maybe it's serendipity? I miss being able to focus on

thoughtful antitrust analysis of the hard questions, and I definitely wasn't getting it at Weil, and I don't think I would at another firm. . . .

I'm still so upset about this. I knew I didn't want to be at Weil anymore, so I know this is right. I just wish I could have made the decision myself. I guess the whole shortening-the-partner-track thing was actually not a good thing for me. They made it sound like the counsel thing was automatic, but I must have understood it wrong. I guess I should have read between the lines. I hate being told that I'm not good enough and knowing that this is the way I'm perceived. I hate that myself worth is so tied up in how well I can do my job. I feel so shitty right now. I want to be good again. Thanks so much." **Exhibit C**.

43.    When Mr. Wright responded that he would be happy to meet, but he was stuck in the Florida Keys, Defendant Landry responded, "OMG, stuck in the keys?! Definitely a disaster. I'm so sorry :) Let's get together later in the week. I'm going to work on my resume and stuff, and also work, tmrw. Just let me know what works for you. My schedule is pretty open..." **Exhibit C**.

44.    After the two met over coffee, she thanked him for his help and outlined the plan he put together for her:

Thank you SO MUCH for meeting with me today. I'm starting to feel better about my career prospects now, and I can't tell you how much that means to me. I've submitted the application to Verizon and reached out to [name], and I'm hoping to get in touch with [name] soon. . . . Other items and next steps in the action plan: Potential in-house opportunities at Amazon, Walmart, Qualcomm, or Facebook; Potential opportunities with policy-oriented groups; Get in touch with [name] to discuss careers in antitrust policy and potentially a position working for the antitrust subcommittee; Get in touch with [name]. Thanks again. Have fun at practice! **Exhibit C**.

45.    When Defendant Landry continued to struggle with finding a job, Mr. Wright provided her encouragement: "Most importantly, keep your head up and be patient. I know that is hard right now. But there is no failure on your part. And you

will work again and more than you want to in no time! :) The most important thing is to get the right situation picked to foster a good spot for you moving forward. So be patient." **Exhibit C**.

46.     As late as March 2019, Defendant Landry sent Mr. Wright a series of emails in a very casual tone, containing emojis and elongated words like "hiiii" which was clearly friendly and cordial.

47.     Apparently, however, Defendant Landry's friendly demeanor was reserved for times that she needed something from Mr. Wright. In approximately February 2020, Mr. Wright heard from his then and current girlfriend that Defendant Landry was still angry and had been saying derogatory things about him and their prior relationship. Mr. Wright's then and current girlfriend, who was close with Defendant Landry—so close that she officiated Landry's wedding—asked him to make amends with Landry. When he attempted to do so, Defendant Landry was clearly still raw about their relationship and said once again that "I was willing to do anything to be with you".

48.     These words, and those from December 2016, are not those of someone who was pressured to be in a relationship with Mr. Wright, as she is now claiming. These are the words of a scorned woman who had strong feelings for him.

49.     Defendant Landry was therefore primed and ready to join Defendant Dorsey's attack on Mr. Wright. The two of them met as early as January 1, 2022, and agreed to take acts jointly against Mr. Wright. Among those, Defendant Landry made

11

false allegations to GMU's Title IX office in support of Defendant Dorsey's complaint. It did not end there.

### Defendants Target Mr. Wright's Clients and Demand Millions of Dollars

50.    Over the next several months, Defendants escalated their attacks on Mr. Wright. They used their intimate and insider knowledge of his life to directly contact his clients, employers, and colleagues to spread their lies, and to destroy his reputation. They have been devastatingly successful. Defendants repeated the same lies that they told to GMU, including that Mr. Wright sexually harassed them or they at least indicated to Mr. Wright's clients that he was under investigation for sexual harassment, which was a thinly veiled way of affirmatively saying that he did, in fact, sexually harass his students.  As a result, many of Mr. Wright's clients, not wanting to be associated with these sexual harassment claims, terminated their relationship with him, costing Mr. Wright hundreds of thousands of dollars.

51.    On or about May 6, 2022, Defendants falsely told one of Mr. Wright's major clients that he was prohibited by the American Bar Association from participating in certain professional events, and that he had sexually harassed multiple students or at least that he was under investigation for the same but intending to convey that Mr. Wright did in fact commit those offenses.

52.    The client suspended the business relationship, costing Mr. Wright approximately $600,000 in lost revenue per year in a contract that would have ordinarily renewed, if not grown in scope, every year for the foreseeable future.

53.    Further, Mr. Wright had an expert consulting contract with Kirkland & Ellis LLP. In approximately July of 2022, shortly after Defendant Dorsey began

working at Kirkland, she falsely told the attorneys with authority over Mr. Wright's contract that he had sexually harassed multiple students or at least that he was under investigation for the same but intending to convey that Mr. Wright did in fact commit those offenses. Kirkland immediately terminated Mr. Wright's contract, causing him substantial financial and reputational damages.

54.    Additionally, Defendants spread their lies to practicing attorneys in the antitrust bar, from which Mr. Wright gains significant revenue through referrals. Defendants falsely told at least one antitrust lawyer, in an effort to recruit her into their scheme, that Mr. Wright had sexually harassed them.

55.    After spreading their lies within Mr. Wright's professional circles, Defendants Dorsey and Landry, through their shared attorney, made a multi-million-dollar demand to keep them from further ruining his reputation with a meritless lawsuit.

## Defendants Go Public with Their Lies

56.    On the very day that Mr. Wright refused to pay what he viewed as an extortionate demand, Defendants each created Twitter accounts.

57.    As if taken from a plot in a bad movie, Defendant Dorsey's first post on her newly created Twitter account stated: "I held out as long as I could…But now I have things to say" with a meme showcasing actress Amanda Bynes and the caption "I'm very pleased and scared to be here."

13



**Elyse Dorsey** @ElyseOnLife · Aug 8
I held out as long as I could…

But now I have things to say.



58.    This "teaser" was no doubt created to draw people into a story that was about to be shared worldwide on the internet.

59.    Defendants Dorsey and Landry began following high-profile accounts in antitrust law, and journalists to cause maximum harm to Mr. Wright when they shared their false stories.

60.    Defendants contacted Aebra Coe with Law360, to publish their story.

61.    Law360 agreed and published the story on August 14, 2023, titling it 'I suffered silently' Ex-Law Prof Allegedly Preyed on Students.' Once published, it took the legal world, and especially the antitrust bar by storm. It was shared countless times on social media; harmful memes were created; and the public devastation began.

62.    After Law360 published its story, many other news platforms began publishing stories of their own based upon what was stated in the Law360 article.

14

The list of those news organizations includes but is not limited to The Daily Mail, Law.com, and Above the Law.

63.    The Law360 article, attached and incorporated as **Exhibit D** (the "Article"), contains numerous lies and omissions which taken as a whole created—and were intended to create—the false implication that Mr. Wright abused his position as a law professor to pressure Defendants into having unwelcome sexual relationships with him and that he retaliated against them as a result of them ending the relationships.

64.    For example, in the Article, Defendant Dorsey claims that, prior to any sexual relationship, Mr. Wright essentially tricked her into accompanying him to what she thought was a platonic business trip to California to meet with clients, and then—to her great surprise—found that when they arrived there was "only one room with one bed" and that there were no client meetings. She claims that in the hotel room she "didn't really feel like I had a choice" to engage in sexual contact with Mr. Wright, which she claims was the first time they had been intimate.

65.    This account is a lie. While the trip itself did happen, Defendant Dorsey and Mr. Wright were already in a romantic, sexual relationship, which changes the entire context of the events. The trip was not some ruse to get Defendant Dorsey into a hotel room alone, it was a romantic getaway for two lovers to spend time in wine country.

66.    Defendant Dorsey's false account is straight out of a bad movie and is intended to portray Mr. Wright as a sexual predator and herself as a victim.

67.    Defendant Dorsey also claims in the Article that Mr. Wright pressured her to keep their relationship a secret. This is similarly misleading, as it leaves out the fact that Defendant Dorsey also expressed her desire to keep the relationship secret, since both of them were married. Once again, Defendant Dorsey creates the implication that secrecy was one-sided and was intended by Mr. Wright to exercise power over her, when in reality, the desire for discretion was mutual for two consenting adults who were both married and did not want their respective spouses to know about the relationship.

68.    Defendant Dorsey also leaves out the crucial context of their 11-year history of close, and often intimate relationship. She leaves out the fact that she continued to be involved with Mr. Wright long after graduating from law school. She knowingly took jobs working at the same company and would resume their romantic relationship even when they were not at the same company.

69.    When Defendant Dorsey describes confronting Mr. Wright about an affair with another former GMU law student, she fails to mention that this person was not just some "former GMU student" but was a romantic rival; a woman who also had a long-term on-and-off relationship with Mr. Wright, which had overlapped with Defendant Dorsey's romantic relationship. Once again, Defendant Dorsey intends to portray Mr. Wright as a sexual predator, but in reality, this is about a love-triangle among consenting adults. Defendant Dorsey creates the false impression that this affair was something new she had just learned, when in fact she had known about the relationship for many years and that she was upset not because this was a "former

16

GMU student" but because it was her romantic rival, and that Mr. Wright had chosen her over Dorsey. Indeed, Defendant Dorsey was well aware that Mr. Wright and this "former GMU student" are still together in a committed relationship, and she intentionally leaves out that information to create the false implication that Mr. Wright preys on students.

70.    Defendant Dorsey then claims that Mr. Wright retaliated against her after *she* ended the relationship. This is false on every level. Not only do her own texts show that it was Mr. Wright who definitively ended the relationship with her, but she also knew based on emails and the evidence in the underlying Title IX case that Mr. Wright had in fact continued to help her professionally, and that he did not have any authority over her employment at GMU, which she says ended abruptly.

71.    Defendant Landry's allegations are similar to Dorsey's, and are similarly dishonest. She claims to have felt that "she couldn't say no to Wright" and that she was constantly fearful of what might happen to her professionally if she didn't maintain a sexual relationship with Mr. Wright. The overall implication of Defendant Landry's allegations is to portray Mr. Wright as a sexual predator, and herself as a victim.

72.    As shown in the multitude of texts and emails, Defendant Landry maintained her consensual relationship with Mr. Wright for years after graduating, and was upset when the relationship ended. She said that Mr. Wright was what she "wanted" and that she was "willing to do anything to be with [Wright]."

73.    Defendant Landry then tweeted that Mr. Wright was the Harvey
Weinstein of law, intending to and creating the impression that Mr. Wright was a
vile predator who forced women to have sex with him:



74.    Defendant Landry implied in the Law360 article that Mr. Wright never
assisted her with work or with professional connections after their sexual contact
ceased, stating, "once he was done with me, those things stopped coming." This is
demonstrably false, as shown by emails and text messages between Defendant
Landry and Mr. Wright in 2019 when, well after any sexual relationship had ended,
Mr. Wright went to great lengths to assist her in her time of professional need when
she was pushed out of her law firm job and seeking advice and new employment.

75.    The Law360 article also reported that GMU has a consensual
relationships policy. Notably, the consensual relationships policy is a disclosure
policy that went into effect on June 28, 2012. Defendants Dorsey and Landry
graduated in May 2012 and therefore that policy was not in effect at the time.

76.    As a result of the publication of the Law360 article, Mr. Wright lost
renewing contracts with multiple major consulting clients and employers, with a total

value of approximately $1.55 million/year. He continues to suffer damages and lost business.

77.    Defendants used the hashtags #metoo and #metoolaw, attempting to use the momentum of the 'MeToo' movement to gain their own notoriety and fame.

78.    Defendants' allegations of sexual misconduct were made with actual malice because both Defendants Dorsey and Landry knew that they were false and that they were never subjected to any sexual misconduct by Mr. Wright; rather, they participated in years-long consensual romantic relationships as well as friendships with him.

## COUNT I
## DEFAMATION AND DEFAMATION *PER SE*
### (Against Both Defendants)

79.    Mr. Wright incorporates herein the allegations contained in all preceding paragraphs.

80.    To recover under defamation, a plaintiff must prove (1) publication of (2) an actionable statement with (3) the requisite intent.

81.    In communications with Mr. Wright's employers, clients, and the media, Defendants purposely caused to be published false and defamatory statements, both directly and by implication, about Mr. Wright with the intent on harming Mr. Wright.

82.    Specifically, they falsely alleged to multiple clients, employers, and colleagues that Mr. Wright had conducted sexual misconduct.

83.    They alleged in the Law360 article and in tweets, by direct allegations and by implications, that Mr. Wright was a sexual predator and had engaged in sexual harassment and misconduct.

19

84.    Defendants, as alleged herein, made their statements with the design and intent of implying falsely that Mr. Wright had engaged in sexual misconduct with them and with other women and that he had utilized his position as a professor to retaliate against them and other women. Defendants did so in a context that would cause reasonable listeners and readers to infer their intended defamatory meaning. Mr. Wright has suffered greatly as a result.

85.    Defendants' campaign smeared Mr. Wright as a sexual predator and they told specific lies about him not helping them with their careers after the sexual relationship ended. Additionally, by claiming that they felt they could not say "no," they are falsely claiming that the relationship was not consensual.

86.    A plaintiff may recover under defamation *per se* where a defendant's defamatory publications are (1) those which impute to a person the commission of some criminal offense involving moral turpitude, for which the party, if the charge is true, may be indicted and punished; (2) those which impute that a person is infected with some contagious disease, where if the charge is true, it would exclude the party from society; (3) those which impute to a person unfitness to perform the duties of an office or employment of profit, or want of integrity in the discharge of the duties of such an office or employment; or (4) those which prejudice such person in his or her profession or trade.

87.    Defendants' statements were defamatory *per se* because they falsely accused Mr. Wright of sexual harassment and misconduct, which at a minimum, prejudices Mr. Wright in his profession or trade as a law professor and lawyer.

88.     Defendants Dorsey and Landry published the lies to Mr. Wright's clients, employers, and the media.

89.     Those publications were false accusations of sexual harassment, which constitutes defamation *per se*.

90.     In doing so, Defendants acted with actual malice or with a reckless disregard of the truth or were at least negligent in making those statements.

91.     The defamatory statements have directly and proximately caused Mr. Wright to suffer significant damages, including pecuniary damages, damage to his reputation, humiliation, embarrassment, and mental anguish, all of which are ongoing in nature and will be suffered in the future. These damages were foreseeable to Defendants.

92.     Because Defendants published the defamatory communications knowingly, intentionally, willfully, wantonly, and maliciously, with intent to harm Mr. Wright, or in blatant disregard for the substantial likelihood of causing him harm, Mr. Wright is entitled to an award of punitive damages.

93.     As a direct and proximate result of Defendants' conduct, Mr. Wright is entitled to compensatory, special, and punitive damages. Mr. Wright is also entitled to injunctive relief and to attorney fees for Defendants' malicious and wanton conduct.

## COUNT II
## TORTIOUS INTERFERENCE
### (Against Both Defendants)

94.    Mr. Wright incorporates herein the allegations contained in all preceding paragraphs.

95.    Tortious interference includes (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

96.    Here, Mr. Wright meets the elements for tortious interference, whether for tortious interference with contractual relations or business expectancy.

97.    Mr. Wright had a contractual relationship or business expectancy with his clients. Specifically, he held contracts with his major consulting client (known to Defendants Dorsey and Landry) and with Kirkland, and an employment contract with GMU, among others. He also had an established practice of gaining referrals through attorneys at the antitrust bar.

98.    Defendants had knowledge of the contractual or business relationships, due to their previous friendship and contact with Mr. Wright as well as evidenced by them purposefully calling or reporting to these clients and contacts to sabotage Mr. Wright's relationships with them.

99.    Defendants intentionally contacted Mr. Wright's clients and contacts with the purpose of ending the contractual or business relationship and succeeded in this purpose.

100.    As a direct and proximate result of Defendants' conduct, Mr. Wright has been damaged in his relationships with these clients and contacts and is entitled to compensatory damages.

## COUNT III
## STATUTORY CONSPIRACY
### (Against Both Defendants)

101.    Mr. Wright incorporates herein the allegations contained in all preceding paragraphs.

102.    Mr. Wright also has claims for business conspiracy arising under Va. Code §18.2-499 and Va. Code §18.2-500.

103.    To recover in a business conspiracy theory, a plaintiff must show (1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business and (2) resulting damage to plaintiff.

104.    Here, Defendants combined their efforts to falsely accuse Mr. Wright of sexual misconduct to destroy his professional reputation and business.

105.    Mr. Wright was then fired by or lost contracts with several of his high-paying clients.

106.    As explained above, Defendants' relentless and malicious conduct constitutes tortious interference, which triggers the business conspiracy statute.

107.    As a direct and proximate result of Defendants' conduct, Mr. Wright has been damaged in his relationships with these clients and is entitled to compensatory damages.

108.    Therefore, Defendants are liable for business conspiracy and subject to recovery of "three-fold the damages by [Mr. Wright] sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel." Va. Code §18.2-500.

## COUNT IV
## COMMON LAW CONSPIRACY
### (Against Both Defendants)

109.    Mr. Wright incorporates herein the allegations contained in all preceding paragraphs.

110.    Mr. Wright also has viable claims for common law conspiracy under Virginia common law. "In Virginia, the elements of a common law civil conspiracy claim are (i) an agreement between two or more persons (ii) to accomplish an unlawful purpose or to accomplish a lawful purpose by unlawful means, which (iii) results in damage to plaintiff." *Firestone v. Wiley*, 485 F. Supp. 2d 694, 703 (E.D. Va. 2007), *citing Glass v. Glass*, 228 Va. 39, 47, 321 S.E.2d 69 (1984).

111.    Here, Defendants combined their efforts to falsely accuse Mr. Wright of sexual misconduct to destroy his professional reputation and business.

112.    Mr. Wright was then fired by or lost contracts with several of his high-paying clients.

113.    As a direct and proximate result of Defendants' conduct, Mr. Wright has been damaged in his relationships with these clients and is entitled to compensatory damages.

114.    Therefore, Defendants are liable for damages for common law conspiracy.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Joshua Wright, by counsel, demands judgment against Defendants, Elyse Dorsey and Angela Landry, as follows:

a.   An award of compensatory, special, and punitive damages of one hundred and eight million dollars ($108,000,000), plus pre-judgment interest;

b.   Injunctive relief prohibiting the publication or republication of the defamatory statements;

c.   An award of Plaintiff's costs associated with this action, including but not limited to his reasonable attorneys' fees and expenses; and

d.   Such other and further relief that this Court deems just, equitable, and proper.

## JURY DEMAND

Plaintiff Joshua Wright demands a trial by jury.


Dated: August 24, 2023                    Respectfully submitted,

Jason C. Greaves, VSB No. 86164
Lindsay R. McKasson, VSB No. 96074
Benjamin F. North, VSB No. 97439
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
T: (703) 888-1943
F: (703) 888-1930
jason@binnall.com
lindsey@binnall.com
ben@binnall.com

*Attorneys for Plaintiff*

# Exhibit A















# Exhibit B

From: **Angela M Diveley** angela.diveley@gmail.com
Subject: In case you blocked me on whatsapp
Date: December 5, 2016 at 20:40
To: Josh Wright joshua.wright@gmail.com, Joshua Wright profwrightgmu@gmail.com



Because it no longer says you're online

 **Messages** ●●●○○ LTE      23:39        55% ▬

 **Josh Wright**      ▢◁   ☎

Lol. Yeah. This is me. Walking away. Quitting on you after you already quit on me.
23:35

I didn't quit on you     23:36 ✓✓

I know that now     23:36 ✓

YOU were the one who told me you didn't want to be with me after five years     23:36 ✓

You can't blame me for leaving a toxic relationship     23:37 ✓

I want to move past it     23:37 ✓

It was fucking toxic     23:37 ✓

I was suicidal because of you     23:37 ✓

Because you were what I wanted and you couldn't be with me     23:37 ✓

So don't get mad at me for trying to cut that part out of it

23:38 ✓

And don't act like I'm somehow the one who's wrong when I'm still trying to be friends with you

23:38 ✓

Because I value you as a friend and want you in my life

23:38 ✓

# Exhibit C

Gmail

Ben North <ben@binnall.com>

**Fwd: Next steps...**
5 messages

**Joshua Wright** <joshua.wright@gmail.com>                                                                                          Tu
To: Lindsay McKasson <lindsay@binnall.com>, Ben North <ben@binnall.com>

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

---------- Forwarded message ----------
From: **Angela (Diveley) Landry** <angelamdlandry@gmail.com>
Date: Thu, Mar 7, 2019 at 10:24 PM
Subject: Re: Next steps...
To: Joshua Wright <joshua.wright@gmail.com>

Hi! I hope you're feeling better. Maybe tmrw or Monday (or sometime over the weekend) if you have time to talk? If you're not feeling well, no worries, of course. Just thought I'd check in bc i'n Tuesday and was  hinking it might be helpful to talk before then. Thank you!!

On Wed, Mar 6, 2019 at 12:59 Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Oof,  hat sucks! I'm sorry! Yes, happy to talk on the phone later, or if you're still not feeling well, happy to reschedule (call or mtg). Whatever works for you. I hope you feel better soon!

On Wed, Mar 6, 2019 at 12:56 Joshua Wright <joshua.wright@gmail.com> wrote:
Hey— I woke up vomiting and stuff.  Went back to sleep. So still at home. Was hoping to wake and feel better but that's not happened …

Talk on phone later?

Sent from my iPhone

On Mar 6, 2019, at 12:17 PM, Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:

Hiiii. Any thoughts yet? I'm sure you're super busy. Sorry for bugging you.

On Wed, Mar 6, 2019 at 08 09 Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Mason is easier to drive to, but I could do Wilson no problem

On Wed, Mar 6, 2019 at 00:42 Joshua Wright <joshua.wright@gmail.com> wrote:
I think it should be good still.  I just don't know if I'll be at Mason or Wilson…

Is one or other better for you?

On Wed, Mar 6, 2019 at 12:41 AM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Gotcha. So 2:30 is no good now? Just let me know when and where!

On Wed, Mar 6, 2019 at 00:25 Joshua Wright <joshua.wright@gmail.com> wrote:
Yes.  Not sure exac ly when.

On Tue, Mar 5, 2019 at 9:22 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Haha true. …still meeting tmrw?

On Tue, Mar 5, 2019 at 20:31 Joshua Wright <joshua.wright@gmail.com> wrote:
Always true

Sent from my iPhone

On Mar 5, 2019, at 8:29 PM, Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:

They did NOT let you talk enough today!

Thoughts on where to meet tmrw?

On Sun, Mar 3, 2019 at 21:44 Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Ok, will check with you Tuesday for 2 pm We'd. Thanks so much! I really appreciate it.

Hope your travels have been alright and you get some rest

On Sun, Mar 3, 2019 at 21:42 Joshua Wright <joshua.wright@gmail.com> wrote:
Not sure yet where I will be.  Check Tuesday night?

On Sun, Mar 3, 2019 at 9:41 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Ooh interesting. Can't wait to hear what you have to say!

How about 2pm? Should I meet you at Mason again?

On Sun, Mar 3, 2019 at 21:39 Joshua Wright <joshua.wright@gmail.com> wrote:
Senate hearing on competi ion "in general" … on Tuesday.

Any time Wednesday afternoon is good.

On Sun, Mar 3, 2019 at 9:37 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
No worries! Wednesday works. What time is best for you? Any time should work for me. Pretty much no updates since  he last one re Freshfields. I
things have stagnated, and I don't really know what to do next. I need your help!

What are you tes ifying on??

On Sun, Mar 3, 2019 at 21:22 Joshua Wright <joshua.wright@gmail.com> wrote:
Hey very sorry -- been traveling a bunch. Testifying in Congress Tuesday.

Talk Wednesday?

What is the state of play?

On Fri, Mar 1, 2019 at 11:09 AM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Hi, sorry to keep bugging you. Just following up on this.

Thanks!
Angela

--
Angela D Landry

On Wed, Feb 27, 2019 at 9:24 AM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Hi, checking in. I hope your trip is going well! Any thoughts on when you might be available next week? The sooner the better for me, so I'm
suggest Monday morning, but please let me know if there's a better time for you.

Thank you

On Thu, Feb 21, 2019 at 22:13 Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
That's should work. I'm free any time, so whatever works best for you!

On Thu, Feb 21, 2019 at 19:39 Joshua Wright <joshua.wright@gmail.com> wrote:
I'm gone all next week.

Week afteR?

On Thu, Feb 21, 2019 at 4:36 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Well it sounds like Freshfields is mine if I want it. I like the idea because it's probably a better fit than Weil, it would give me a few mor
biglaw to figure out if it's what I want, and it's a chance to start fresh. I'm still really not sure and would love to talk to you about it som
I could weigh  he pros and cons. It's so weird because I feel like FBD would be  he "easy" way out of this situation, and as far as easy
it's an amazing opportunity! Also, he's going to reach out to a few people he knows to see about in-house opportunities in DC. We en
him saying I should really  hink about going back, so it sounds like he's not just saying it and I could get screwed, you know?

Trying to keep my head up. This meeting def helped... I just want to find the right place, and it sucks because there's just not a ton of

When are you free to meet/chat? I obviously am flexible

On Thu, Feb 21, 2019 at 19 08 Joshua Wright <joshua.wright@gmail.com> wrote:
Got it.

How did Bruce meeting go?

Most importan ly, keep your head up and be patient.  I know that is hard right now.  But there is no failure on your part.  And you wil
again and more than you want to in no time! :)  The most important thing is to get  he right situa ion picked to foster a good spot for
moving forward.  So be patient.

The DC in-house jobs would probably be limited to Verizon and maybe a handful of  hers!  But not many.  So that's probably right

On Thu, Feb 21, 2019 at 11:35 AM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Update: Meeting with Rob yesterday was canceled because of the weather. He said he's out of town next week, so we're going t
meet the week after, BUT I'm meeting with Bruce today. We'll see how that goes. I'm tempted to see if they'd be willing to take i
but I have really mixed feelings on whether I want to stay in biglaw (still mulling the question of whether it's biglaw or Weil that
miserable...). On the in-house issue, I'm not sure whether meeting with him will be that helpful. The other day when I talked to
suggested it would be difficult, if not impossible, for me to stay in DC.

I'm so stressed, but I'm also bored, which is just making me feel generally restless. I can't stop feeling like a total failure. And I j
to work again. I feel so worthless right now :(

--
Angela D Landry

On Mon, Feb 18, 2019 at 12:54 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Great, thank you! Maybe we can meet when you get back? Unless you think there's anything we should talk about sooner rath
later. If so, let's try to chat Thursday?

On Sat, Feb 16, 2019 at 19:14 Joshua Wright <joshua.wright@gmail.com> wrote:
Great re DOJ.  And Koren contacted me about making contact with DOJ and others and I gave her a recommendation she c
with.

I'm going to be in LA  his week --- but can always talk, etc. I'm also going to be talking to Aubrey shortly.  Not sure when.  Sl
she would tell me when VZ was moving.

On Sat, Feb 16, 2019 at 7:06 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
No worries! I figured I'd be able to bother you in person yesterday if I didn't hear back :)

Thank you for the feedback on the cover letter and for reaching out to Aubrey and David Wheeler!

I've submitted the application to the DOJ. I also met with Koren today, and she offered to send my resume to Bob Potter.
know the best way to handle that between you guys, but I wanted to make sure you know so that he's not getting overlo
information about me! I haven't sent her my resume yet, but I know she gets gung-ho about things like this sometimes, s
know if she's already reached out yet. Also, I didn't tell her the details about why I'm leaving; I just told her that I'm looki
leave. It sounds like she really likes working in-house. The more I think and hear about it, the more it seems like going in
somewhere would be a great move for me. Here's hoping it happens!

As for our next meeting, I have an alumni board meeting this Thursday at 7pm at Mason. If you'll be around before then,
could meet up then?

Thank you!!!

--
Angela D Landry

On Sat, Feb 16, 2019 at 1:21 AM Joshua Wright <joshua.wright@gmail.com> wrote:
Sorry I missed  his! Cover letter looks great. I'd delete "and their effects on consumer welfare" from the beginning.  No c
changes.  Not that those words are a problem --- just .. proper scope seems to imply it?  Anyway ... all good.  I've also e
Aubrey.

Will follow up with Wheeler shortly.


I'd be happy to sing your praises to whoever at the DOJ.  That would be a great gig. I can also affirmatively reach out to
there once you've applied.  Let me know when.


On Thu, Feb 14, 2019 at 2:33 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Hey Josh - Following up on my last email, I'm working on a cover letter for the DOJ position. Do you think you could
at it and let me know what you think? I'm also required to include a writing sample that's under 15 pages. I'm thinkin
including either the attached one on the new FTC Commission or the Section 5 paper with you. Unfortunately, I don't
anything recent that I didn't co-author/that falls within the page limit. Do you think that's ok? I'm leaning toward the
writing sample because it's non-controversial and I wrote it myself (as opposed to co-writing with you; Well just slapp
Carrie's name on it after I got minor edits on a couple sentences from the partners). I would appreciate any thoughts
you might have!

Also just following up re a recommendation email to Aubrey (or David Wheeler?) and any other leads you might have

See you tomorrow at the symposium!

Thank you!!
Angela

--

Angela D Landry

On Tue, Feb 12, 2019 at 12:18 PM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Hi, checking in. I just met wi h Aubrey, and the more I hear about the job, the more I think I'm perfect for it. She did
super competitive—like there are 15 h year lawyers who are partners applying (though it's for  he position Jen was
promoted out of, so I think I'm better suited)—so it would be helpful to have a reference send her an email she can
Would you be comfortable sending her something, please? I also could try to have Steve B (or Brianne) send an er
I'm concerned that having a current employer as a reference might not look good, and the firm is hesitant to do writ
references, so I'd probably have to pull teeth to get them to do it informally like this.

Also, I met with Bilal last Friday, and he told me about a position in the DOJ's policy group that's open. Any thought
one? I'm planning on applying  his week. He also (re)connected me with Rob Mahini, who suggested we grab coffe
trying to schedule that.

Have you heard any hing about any o her potential leads?

Thank you so much! I need all the help I can get right now. I'm so stressed

On Wed, Feb 6, 2019 at 11:58 Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Ok, I'll talk to both of them. Thank you!
--
Angela D Landry

On Wed, Feb 6, 2019 at 11:19 AM Joshua Wright <joshua.wright@gmail.com> wrote:
you should talk to Bruce --- at a minimum for the advice.  And maybe FBD would be interesting.  Up to you! Bu
talking to them you know?  You should talk to Jan too.  Because he's Jan.

On Wed, Feb 6, 2019 at 10:48 AM Angela (Diveley) Landry <angelamdlandry@gmail.com> wrote:
Ok, so sent my resume to Aubrey. I have coffee scheduled with her for Tuesday, and I have a meeting with
Friday and with Koren next Wednesday.

Then there's the symposium on the 15th...will you be there? I was thinking about reaching out to Bruce--or
just letting him know what's going on if I see him at the symposium. I don't know that I'd want to go back t
(they have lots of senior associates, I don't know if I want to continue in biglaw life {though maybe it just w
good fit at Weil}, and I don't know that they'd want me anyway), but I figure he's a good resource. He's alw
supportive and could give me some leads. Any thoughts?

--
Angela D Landry

On Tue, Feb 5, 2019 at 9:48 AM Joshua Wright <joshua.wright@gmail.com> wrote:
Very good

Sent from my iPhone

On Feb 5, 2019, at 9:19 AM, Angela Landry <angelamdlandry@gmail.com> wrote:


Aubrey got back to me and asked me to send her my resume directly. Woo!

--
Angela D Landry

On Mon, Feb 4, 2019 at 7:35 PM Joshua Wright <joshua.wright@gmail.com> wrote:
My pleasure!

Yes re Bilal's address.

Will start on my homework tonight.

On Mon, Feb 4, 2019 at 7:22 PM Angela Landry <angelamdlandry@gmail.com> wrote:
Thank you SO MUCH for meeting with me today. I'm starting to feel better about my career prospects now, and I can't tell you how much that means to me.

I've submitted the application to Verizon and reached out to Aubrey, and I'm hoping to get in touch with Bilal soon. Would you happen to know his email address? I assume it's bsayyed@ftc.gov, but I thought I'd check with you first in case you know for sure.

Other items and next steps in the action plan:

- Potential in-house opportunities at Amazon, Walmart, Qualcomm, or Facebook
- Potential opportunities with policy-oriented groups
- Get in touch with Phil Alito to discuss careers in antitrust policy and potentially a positic working for the antitrust subcommittee
- Get in touch with Koren

Thanks again. Have fun at practice!

--
Angela D Landry

On Mon, Feb 4, 2019 at 12:22 PM Angela Landry <angelamdlandry@gmail.com> wrote:
Awesome, see you then!
--
Angela D Landry

On Mon, Feb 4, 2019 at 12:21 PM Joshua Wright <joshua.wright@gmail.com> wrote:
Yeah that works.

On Mon, Feb 4, 2019 at 12:14 PM Angela Landry <angelamdlandry@gmail.com> wrote:
Coffee at 3 sounds perfect. Meet in the Hazel Hall atrium?
--
Angela D Landry

On Mon, Feb 4, 2019 at 12:03 PM Joshua Wright <joshua.wright@gmail.com> wrote:
Late lunch? 1230? 1?

Or coffee around 3 or 330?

Sent from my iPhone

On Feb 4, 2019, at 12:02 PM, Angela Landry <angelamdlandry@gmail.com> wrote:

Yep! What time works for you?
--
Angela D Landry

On Mon, Feb 4, 2019 at 11:57 AM Joshua Wright <joshua.wright@gmail.com> wrote:
Can you come to mason?

Sent from my iPhone

On Feb 3, 2019, at 1:12 PM, Angela Landry <angelamdlandry@gmail.com> wrote:

Awesome, thank you! Let's do coffee tmrw. Where will you be? I'm not gonna go into the office tmrw, so I'm flexible.

On Sun, Feb 3, 2019 at 11:45 Joshua Wright <joshua.wright@gmail.com> wrote:
Resume looks great. I wouldn't change anything. I might have to take James to wrestling tomorrow evening — waiting to see what carpool looks like. But ... probably best to plan for coffee instead? Just in case. Or meet Tuesday later. Your call.

On Sun, Feb 3, 2019 at 9:47 AM Angela Landry <angelamdlandry@gmail.com> wrote:
Hi – My resume is attached. Do you think you could take a look and let me know if you have any comments? I'm planning on submitting it to Verizon before we meet up tomorrow. Also, please let me know if you still want to do drinks at Pisco y Nazca or something else?

Thanks!
Angela

--
Angela D Landry

On Wed, Jan 30, 2019 at 6:23 PM Angela Landry
<angelamdlandry@gmail.com> wrote:
> Ok, I'll wait on the Verizon applica ion till Monday.
> I'm going to see if they can speed up their review of
> my resume and will send it to you for any thoughts
> before i submit it.

> Let's do Monday. Do you still want to do Pisco y
> Nazca? I could do lunch or earlier drinks or could
> meet you elsewhere if you won't be in he area.

> Thank you! Hope you're enjoying Florida. It's still
> freeeezing here.

> On Wed, Jan 30, 2019 at 15 57 Joshua Wright
> <joshua.wright@gmail.com> wrote:
>> Hey --- stuck in Florida doing extra teaching and
>> back tmrw. Could meet Friday hough? Or
>> Monday?

>> Verizon isn't doing anything with that job before
>> Monday so I'd wait un il then --- when resume is
>> ready. no cost to waiting. but you should apply.
>> that's a good idea. and sbsolutely i can review for
>> you.

>> On Wed, Jan 30, 2019 at 12:39 PM Angela
>> Landry <angelamdlandry@gmail.com> wrote:
>>> Hey - Checking in. Any thoughts on when you
>>> want to meet? I could do today or tomorrow
>>> this week. Otherwise, maybe Monday? I think
>>> I'm going to discuss going part time/working
>>> on just the matters I'm currently staffed on so
>>> that I can focus on the job search. I just don't
>>> see the value in continuing to spend time on
>>> working, as I don't think there's much
>>> additional experience I can get out of it.
>>> Anyway, all of that to say that my schedule
>>> should be pretty flexible going forward.

>>> I also wanted to see if you had any thoughts
>>> on me applying to Verizon now versus
>>> sometime next week. I've begun the process
>>> with the professional outplacement service
>>> Weil has put me in touch with. They're going
>>> to help me with my resume/LinkedIn,
>>> networking, finding available positions, etc. I
>>> feel like my resume is not in good shape; I've
>>> submitted it (and my LinkedIn profile) to the
>>> agency, and they're going to update it, but it's
>>> going to take 3 business days. Do you think it's
>>> a waste of time to wait until Monday or
>>> sometime later next week to submit a much
>>> better resume, or should I try to submit it
>>> asap? If the latter, would you be able to review
>>> it for me, please?

>>> Thanks so much, and I hope you enjoyed/are
>>> enjoying Florida!

>>> Angela
>>> --
>>> Angela D Landry

>>> On Sun, Jan 27, 2019 at 11:42 PM Angela
>>> Diveley <angela.diveley@gmail.com> wrote:

>>>> On Sun, Jan 27, 2019 at 22:21 Joshua
>>>> Wright <joshua.wright@gmail.com> wrote:
>>>>> I mean ... its a little windy here?

>>>>> On Sun, Jan 27, 2019 at 10:04 PM Angela
>>>>> Diveley <angela.diveley@gmail.com>
>>>>> wrote:
>>>>>> Yes, but only if it's worse than it'll be
>>>>>> here—ie, cold getting colder, wi h rain,
>>>>>> then ice, hen snow.

>>>>>> On Sun, Jan 27, 2019 at 20:14 Joshua
>>>>>> Wright <joshua.wright@gmail.com>
>>>>>> wrote:
>>>>>>> Would it be better if I complained that
>>>>>>> the wea her sucks?

>>>>>>> On Sun, Jan 27, 2019 at 7:51 PM
>>>>>>> Angela Diveley
>>>>>>> <angela.diveley@gmail.com> wrote:

OMG, stuck in the keys?! Definitely a disaster. I'm so sorry :) Let's get together later in the week. I'm going to work on my resume and stuff, and also work, tmrw. Just let me know what works for you. My schedule is pretty open...

On Sun, Jan 27, 2019 at 17:46 Joshua Wright <joshua.wright@gmail.com> wrote:
I got it I got it.  Sorry the last two days have been a disaster --- and I feel stupid complaining about them to you given circumstances.  So take my use of "disaster" as hyperbolic and dramatic as per my usual tone :)

I think your email is just fine.

I do need to push back Pisco to later in the week.  I got stuck in Florida at least an extra two days because a GMU prof didn't show up for this econ to judges program and so I'm covering for him. Which sucks.  I'll know for sure how long later ... and I'm sorry its not Monday.  I can def talk tomorrow if you need to talk sooner.  But ... we can get toge her in person later in  he week.

On Sun, Jan 27, 2019 at 10:25 AM Angela Diveley <angela.diveley@gmail.com> wrote:
Just wondering if you got this... I figure the name/email address may have thrown you off. I haven't sent the email and am planning on going to he office next week. Just trying to get myself in the right headspace. I took Friday off to try to process everything. Was feeling better yesterday, but he Sunday Scaries are real like I could never have imagined. I def need to get out and start my next chapter ASAP.

Still on for tmrw, yes? Pisco y Nazca

On Fri, Jan 25, 2019 at 11:25 Angela Landry <angelamdlandry@gmail.com> wrote:
Hey Josh — S ill trying to wrap my head around all this... I hope you don't mind me leaning on you right now. Your support and advice mean everything to me.

Does this email to Steve and Brianne look ok to you? I'm trying to be professional but I need to know what it means to be giving me time to find my next job (basically, are they going to pay me if I'm not doing any actual work and am spending my time looking for a job). I want to keep working on what I've been working on because I don't want to burn any bridges. I also find  he work interes ing. I don't know if I'll be able to do it as well as I want, but I want to try. I want to work remotely next week though because I don't know if I can face anyone there right now.

Also, I'd like to talk to you about the GAI position that's open. I've been thinking for a long time about asking you if there was any poten ial for

me to work there, and I saw your tweet the other day  hat there actually is an opening. Maybe it's serendipity? I miss being able to focus on thoughtful antitrust analysis of the hard questions, and I definitely wasn't getting it at Weil, and I don't think I would at another firm. You know I've always been more interested in the academic side. I'd be very interested in looking at my options on that front. I'm of course open to other options (eg Verizon) if they're available to me, so I'm hoping that's something we can talk about on Monday.

I'm still so upset about this. I knew I didn't want to be at Weil anymore, so I know  his is right. I just wish I could have made the decision myself. I guess the whole shortening- he-partner-track thing was actually not a good thing for me. They made it sound like the counsel thing was automatic, but I must have understood it wrong. I guess I should have read between the lines. I hate being told that I'm not good enough and knowing that this is the way I'm perceived. I hate that my self wor h is so tied up in how well I can do my job. I feel so shitty right now. I want to be good again.

Thanks so much.

— — —

Thanks for  he valuable feedback yesterday. Could you please remind me who I can reach out to so I can start figuring out next steps? Also, is there someone in HR or somewhere who I should reach out to so I can get a better understanding of the logistics of the transition period until I find my next gig?

I'd like to continue working on [the matters I'm currently staffed on] during the transition period and split my time between  hose, any other matters where I can be of help, and the job search. If it would be ok with you and the o her partners, I'd like to work remotely next week while I try to figure out my plan forward. Please let me know if this would be acceptable.

--
—
Angela Landry
**please note new email address**

Sent from my iPhone. Please excuse brevity and typos.
--
—
Angela Landry
**please note new email address**

Sent from my iPhone. Please excuse brevity and typos.

--
—
Angela Landry
**please note new email address**

# Exhibit D



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# 'I Suffered Silently': Ex-Law Prof Allegedly Preyed On Students

By **Aebra Coe**

Law360 (August 14, 2023, 12:11 PM EDT) -- Two women lawyers have told Law360 that former Federal Trade Commission member and George Mason University law professor Joshua D. Wright abused his power in order to engage them in sexual contact, saying the alleged misconduct began while they were his students and later continued when they were his subordinates at the FTC and at a BigLaw firm.



Joshua D. Wright

Kirkland & Ellis LLP partner Elyse Dorsey and Freshfields Bruckhaus Deringer LLP counsel Angela Landry said they met each other in 2009 as first-year students at George Mason University's Antonin Scalia Law School, in a yearlong contract law class taught by Wright.

Both women said that soon after they arrived at the school and started taking the class, Wright began to press the usual boundaries between professor and student in one-on-one conversations with them. Both also said those boundary-pushing comments quickly turned to flirting and, eventually, to sexual advances.

The women said those early advances led to years of misconduct, during which Dorsey and Landry felt they had no option but to continue engaging sexually with Wright or else risk serious damage to their careers. Both said they believe there are "many" more women who have been similarly approached by Wright, based on conversations with former schoolmates and colleagues, as well as a

conversation between Landry and Wright himself.

Both women said their fears that their careers were at risk later proved to be valid. After they ended their respective sexual relationships with Wright, both said, they were cut off from professional opportunities and even jobs as a result of Wright withdrawing his support of them and their careers.

Dorsey and Landry only recently reconnected after a mutual friend from law school suggested they may have similar stories related to their experiences with Wright, they said.

"I suffered silently for a really long time," Landry told Law360 in a video call, pausing for a moment as emotion welled in her voice.

"I was ready to accept suffering silently alone for the rest of my career, but I can't just sit back and let it continue" after discovering others have also been affected by the alleged misconduct, she added.

Wright, who had been a law professor at GMU for two decades, announced Aug. 7 that he was leaving the school's faculty via a post on X, the social media platform formerly known as Twitter.

Later that same day, Cleveland State University College of Law professor Christa Laser publicly posted an email she says Wright sent her in 2021, in which he asks her out on a date after she met with him to discuss faculty job opportunities at GMU.

Laser's post to X has garnered more than 371,000 views and numerous comments. On Aug. 9, legal blog Above the Law featured the post in an article.

According to a spokesperson for GMU's law school, Wright is no longer a member of the school's faculty.

"His departure is a personnel matter, and the university and law school do not comment on personnel matters," the spokesperson said.

Legal counsel for Wright, Lindsay R. McKasson of Binnall Law Group, shared an emailed statement with Law360 on Friday in response to Dorsey's and Landry's allegations.

"All allegations of sexual misconduct are false," the statement said. "These false allegations are being made public after unsuccessfully demanding millions of dollars behind closed doors. We look forward to total vindication in court."

## "It must be much worse for others"



Elyse Dorsey

Dorsey said she was excited when Wright asked her to be one of his research assistants at the end of her first year as a law student in 2010. She had been interested in antitrust law, and he made it clear that he would be a good reference if she wanted to pursue that area of law as a career, she said.

Despite a string of flirtatious comments, Dorsey said, she generally thought Wright was "harmless" at the time and felt reassured by the fact that he was married and had small children. When he asked her to join him on a trip to meet clients in California, she said, she agreed to attend.

They stayed at a nice hotel, and when they arrived she discovered there was only one room with one bed, Dorsey said. There weren't any client meetings during the trip, she said, and instead they went wine tasting.

The morning they were supposed to leave, no sexual contact had occurred, she said, but as they sat on the hotel's bed running late to catch their flight Wright asked her if he could touch her.

"I didn't say no, but I also didn't really feel like I had a choice to do that in the moment," Dorsey said. That led to the beginning of her sexual contact with Wright, she said.

According to Dorsey, she never felt comfortable saying no to Wright, including when, she said, he pressured her to have sex in his office on the law school's campus. She resisted, but gave in "to get out of the situation," she said. Dorsey was Wright's research assistant at the time, and therefore her direct manager.

"He was very clear this had to be a secret, this was something we couldn't talk about, that no one was supposed to know," she said.

However, Dorsey said, she did tell a close friend at the time about her sexual contact with Wright and the trip they took to California. Law360 recently spoke to that friend, and the person confirmed that Dorsey told them about it at the time.

The sexual contact continued throughout Dorsey's law school years, she said. Expecting to graduate in 2012 into a tough job market, she knew that she would need Wright's positive reference.

Dorsey ultimately took a job as an associate at a prestigious law firm — Wilson Sonsini Goodrich & Rosati PC — and in 2013 Wright was nominated to be a commissioner at the FTC. Their sexual contact faded at that point, she said. However, when Wright left the FTC in 2015 and joined Wilson Sonsini as senior of counsel, he again became her direct manager and the sexual contact resumed, she said.

A former colleague of Dorsey's at Wilson Sonsini told Law360 that Dorsey confided in them when they worked together that she had been in a sexual relationship with Wright and that it had started when she was a student at GMU.

In an email to Law360, a spokesperson for Wilson Sonsini said they are not able to comment on internal personnel matters, but confirmed that Wright had been senior of counsel at the firm from January 2016 until November 2019.

Between 2018 and 2021, Dorsey took on a role as an instructor at GMU's law school in the antitrust department, and in 2019 she left Wilson Sonsini to work for the U.S. Department of Justice.

In early 2021, she said, Wright reached out to her to recruit her to work for him as he planned to launch his own law firm, Lodestar Law & Economics PLLC. According to Dorsey, Wright told her that she could work as much or as little as she wanted, so that she had time to pursue a fellowship in the economics department at the University of Virginia.

Dorsey had been interested in returning to private practice and legal academia. That, along with a competitive pay offer, prompted her to turn down other job opportunities at the time and take Wright up on the offer, she said.

Over the summer of 2021, Dorsey moved from Washington, D.C., to Charlottesville, Virginia. There, she said, she began to work for Wright on a contract basis and Wright began to help her with a fundraising effort for her fellowship.

However, after Dorsey confronted Wright saying she believed he was engaged in a sexual relationship with another former GMU student of his and that he had lied about it, and that Dorsey wanted to end things with him romantically, all of those plans began to unravel, she said.

The contract work disappeared, the fellowship funding was delayed and even the work at GMU ended abruptly and without notice, Dorsey said.

Near the end of 2021, Dorsey filed a complaint against Wright with GMU, which included allegations of Title IX violations, including hostile environment and quid pro quo sexual harassment, as well as violations of university policies regarding consensual sexual relationships. Those investigations are ongoing, she said.

The allegations in the university complaint, reviewed by Law360, align with Dorsey's conversations with a Law360 reporter.

In a statement provided to Law360, a spokesperson for GMU's law school did not address the investigation.

In GMU's consensual relationships policy, which is posted on the university's website, employees with professional power relationships over students are advised to avoid sexual relationships with students and, in the event of a relationship, to report it immediately to their supervisor and end any supervisory or instructional responsibility over that student.

"Sexual or romantic relationships between employees and students have the effect of undermining the atmosphere of trust on which the educational process depends," the policy says. "Positions of authority inherently carry the element of power in their relationships with students. It is imperative that those in authority neither abuse, nor appear to abuse, this power entrusted to them."

Law360 contacted the media relations department at GMU law school to inquire whether the same consensual relationships policy was in place when Dorsey attended the law school, and was referred to the school's Diversity, Equity & Inclusion department. A phone call to the DEI department was not

immediately returned.

"I don't want other people to have to deal with and go through what I went through," Dorsey told Law360 about why she chose to file the complaints and speak publicly about her allegations. "It really made me feel like if he was willing to treat me that way ... it must be much worse for others who tried to say no to him with even less power."

## "From there it escalated quickly"



Angela Landry

When Landry started her first semester of law school in 2009, she said, she was nervous and a little lost as the first person in her family to attend law school. It was a welcome relief, she said, when Wright appeared to take her under his wing and eventually offered her a position as a research assistant.

She said Wright told her that if she did well in the position, he could coach her and help her get a job after law school.

According to Landry, throughout that year Wright made comments that seemed to push the usual teacher-student boundaries. For instance, she said, he pointed to her fidgeting and asked if she was nervous, and then followed that up by saying, "It's cute."

"It just slowly escalated. It was a lot of this boundary expansion for months," she said. Then, the February after she'd started law school he kissed her for the first time, she said. "From there it escalated quickly."

Landry said there were often times during their relationship that she felt she couldn't say no to Wright, and that he often reminded her of his connections and sway when it came to her career.

Like Dorsey, Landry also said Wright engaged her in sexual activity while in his office at the law school. If she ever did something to make him angry in their personal relationship, she said, it would come through in their professional relationship and she would stop getting work from him for a period of time, for example.

"Those times it really felt like I can't make him mad, because if I do, he's going to take all of this away from me. Everything I've worked really hard for and that I want in my career," she said.

The sexual contact lasted throughout her time at the law school, according to Landry, and she was able to secure a position at a large law firm after graduating with a good word from Wright to a connection she said he had there.

The sexual contact cooled for a period of time, but it began again when Wright asked Landry to serve as an attorney adviser to him at the FTC in 2015, she said. When she accepted the position, Landry said, she told Wright that she wanted to start with a clean slate and "keep things professional."

"I think he took that as a joke or a challenge," she said.

The sexual contact then resumed, she said, adding, "I always felt like if I made him mad I would lose my job, lose my career and lose everything I worked for."

During the time when their sexual relationship was on, Landry said, Wright helped her secure opportunities to speak on panels, write papers and contribute to the antitrust profession. But after Wright left the FTC and joined Wilson Sonsini, she said, all of that changed.

"Once he was done with me, those things stopped coming," she said.

A spokesperson for the FTC did not respond to a request for comment on Landry's allegations.

According to Landry, she confronted Wright in 2020 about his alleged sexual misconduct after he sent her an email apologizing for his behavior. They met in person and he told her he'd sought sexual relationships with countless women in professional settings, she said.

"He told me he couldn't even count the number of people he sent inappropriate messages to," she said.

## "Too close ... for a work meeting"



Christa Laser

Landry and Dorsey said they decided the timing was right to come forward publicly with their allegations after a flurry of talk within the antitrust law community was ignited by a social media post by Laser, a professor at Cleveland State University law school who shared a story in which she said Wright inappropriately approached her in a professional setting.

Laser told Law360 in an email that after spending years trying to break into legal academia, she was thrilled when she learned in 2021 that the head of GMU law school's antitrust department had agreed to get coffee with her to discuss potential career opportunities.

She said she had reached out to Wright several times between 2018 and 2020 to send applications and also request a coffee meeting to discuss the school's hiring. And in 2021, the timing couldn't have been better for Laser, who had accepted a position at Cleveland State University but later learned that her soon-to-be ex-husband and children would not join her in Ohio due to a custody dispute, she said. A job at GMU, in Fairfax, Virginia, would mean she could be close to her children.

"I stayed in Virginia as long as I could, first teaching remotely during peak COVID-19 and then commuting to Ohio each week to teach," Laser said. "In April 2021, I was at an inflection point with the situation with my ex and custody."

Wright had agreed to meet up with Laser, but for dinner rather than coffee, she said. And while she thought it was odd that he offered to pick her up for the meeting, she said, she shrugged it off.

They discussed Laser's curriculum proposal, teaching package and "other topics typical of an early discussion around hiring," Laser said, adding that she also opened up about her situation with the custody of her children.

According to Laser, Wright told her he loved her curriculum proposal and that he held sway when it came to who would be hired into the current open position. He walked her to her car.

"When we got to my car, he gave me a hug that was long and close, pressing too close to my body for a work meeting," she said. "When I opened my car door and turned to get in, his face suggested to me that he seemed to realize that I viewed this as a professional meeting, not a personal one."

The next day, she said, she received the email that she would later post on social media and which went viral. In it, Wright said, "I hope this doesn't come off as overly forward --- but I really enjoyed dinner and talking with you and thought maybe you might be interested in making next time a 'date'?"

The two never went on a date, and Laser was not offered a job, she said.

According to Laser, she reported her experience to several people at the law school, including its human resources and DEI departments, and also forwarded them her communication with Wright. However, a year later, she still hadn't heard anything, she said, and so she reached back out to see where the investigation stood.

"When I met with [a university investigator] and the DEI team, it seemed they were not made aware of the previous complaints I made against Josh," she said. "I am not aware of George Mason doing anything in response to the information that I sent."

A spokesperson for the law school did not respond to a request for more information on Laser's statements recounting her experience reporting Wright's alleged conduct, beyond reiterating that the school does not comment on personnel matters.

But after continuing to hear stories through the grapevine about alleged misconduct by Wright and after seeing a number of people in the legal community — including a former professor of Laser's — praising Wright when he announced he was leaving GMU, Laser said, she decided to go public with her tweet.

"I didn't want my former professor or others who were praising him to be unintentionally amplifying Josh's ability to prey on more young women," she said.

--Editing by Alanna Weissman and Kelly Duncan.

All Content © 2003-2023, Portfolio Media, Inc.